597 S.E.2d 803

Carol HUNTING, as Guardian ad Litem for
Catherine L. Hitchcock, Respondent,

v.

William ELDERS, Samuel Chris Gordon and
Elmyer Enterprises, Inc., Defendants

**of whom William Elders is, Appellant.**

No. 3778.

Court of Appeals of South Carolina.

Heard Oct. 8, 2003.

Decided April 19, 2004.

Rehearing Denied June 25, 2004.

D. Mark Stokes, of N. Charleston, for Appellant.

Geoffrey H. Waggoner, Richard S. Rosen, and Alex B. Cash, all of Charleston, for Respondent.

STILWELL, J.:

This action was commenced to recover damages sustained by Catherine L. Hitchcock in an accident caused by a drunk driver. Carol Hunting, as guardian ad litem for Hitchcock, brought suit against Chris Gordon as the drunk driver, El-

myer Enterprises, Inc. as the owner and operator of the bar, and William Elders as the alter ego of the corporation. In the first portion of the bifurcated trial, damages of $1.5 million were awarded against Gordon and Elmyer Enterprises. The second phase of the trial, which is the subject of this appeal, resulted in a holding that Elders was the alter ego of Elmyer Enterprises, justifying piercing the corporate veil, thereby holding Elders personally liable for the $1.5 million verdict and the interest which had accrued from the date of the original judgment against the corporation. We affirm.

## FACTS

We discern the following facts from the order of the unappealed first phase of the trial. Gordon became intoxicated while at Willie's, a bar operated by Elmyer Enterprises. Gordon was served alcohol despite being obviously intoxicated. After leaving the bar in an intoxicated state, he caused the accident in which Hitchcock was left permanently brain damaged. Hunting was awarded $1.5 million in actual damages against Gordon and Elmyer Enterprises. The jury also awarded $3,000 and $25,000 in punitive damages against Gordon and Elmyer Enterprises respectively. Subsequently, a non-jury trial was held on the issue of whether to pierce the corporate veil of Elmyer Enterprises and hold Elders liable for the judgment as its alter ego.

The facts as gleaned from the second trial reveal that Elmyer Enterprises was originally incorporated in 1981 and engaged in the business of selling tires. Elders and another shareholder operated the business until Elders bought out the other shareholder. The business then became inactive for several years.

In 1990, Elders opened two bars on property he owned. He originally held the liquor licenses in his own name. In 1993, he reinstated Elmyer Enterprises for the purpose of operating the bars. Each bar was capitalized with $1,000, which was deposited into separate bank accounts. The property and equipment used to operate the bars were leased to Elmyer Enterprises by other businesses formed and owned by Elders. Both bars operated video poker machines, which were leased from yet another of Elders' business corporations. That

particular enterprise owned many more machines than were present in the bars belonging to Elmyer Enterprises.

In December 1993, Elders transferred several shares of stock in Elmyer Enterprises to his wife and niece. He designated his wife as a vice president and his niece as secretary and treasurer. However, his niece testified that she knew nothing about her ownership of shares of stock of Elmyer Enterprises or her selection as an officer of the company. Minutes were recorded that detailed the selections and the stock transfers.

During the trial, Hunting presented the testimony of Jan Waring–Woods, a forensic accountant, who testified money was siphoned from the corporation for Elders' personal use. She testified many records needed for an accurate audit of the corporation were either not created or not made available at the time of trial. After reviewing the corporate tax returns for the various companies Elders owned, as well as some of the records she managed to locate regarding the income of the business, she testified Elders siphoned off between $400,000 and $800,000 from the business over a three-year period. Additionally, she testified some of Elders' personal tax forms were altered prior to trial to eliminate information about dividend income from investment accounts Elders held during the time he ran the business.

Hunting also presented testimony from John Freeman, a law professor at the University of South Carolina. He testified that in his opinion the company was operated as a facade by Elders. Freeman maintained Elmyer Enterprises was grossly undercapitalized given its purpose of operating bars and considering the inherent risks associated with a business dispensing alcohol. His conclusion was that Elmyer Enterprises had income that was unaccounted for and profit that was not adequately revealed. He further testified that, in his opinion, Elders was the alter ego of Elmyer Enterprises.

Elders testified the income was as reported. He claimed detailed records were never kept by the company. He noted that any discrepancies in the records were the result of the way in which the bar was managed. He also argued the business was run as a statutory close corporation and as an S corporation. Therefore, it did not have to meet the normal

business formalities and would likely mirror Elders as the majority shareholder. Elders claimed the business met its ongoing financial obligations and therefore was not undercapitalized.

The trial court found Elders' testimony was not credible, and the evidence presented at trial clearly indicated Elmyer Enterprises was operated as a mere facade for Elders. Thus, the court concluded Hunting met the burden of proof in establishing the factors necessary to pierce the corporate veil and hold Elders personally liable for the judgment originally awarded against Elmyer Enterprises.

## STANDARD OF REVIEW

An action to pierce the corporate veil lies in equity, and therefore, this court may determine the facts according to its own view of the preponderance of the evidence. *See C.T. Lowndes & Co. v. Suburban Gas & Appliance Co.*, 307 S.C. 394, 396, 415 S.E.2d 404, 405 (Ct.App.1991); *Sturkie v. Sifly*, 280 S.C. 453, 456–57, 313 S.E.2d 316, 318 (Ct.App.1984). The broad scope of review applicable to appeals in equity actions does not, however, require an appellate court to disregard the findings below or ignore the fact that the trial judge is in the better position to assess the credibility of the witnesses. *Pinckney v. Warren*, 344 S.C. 382, 387, 544 S.E.2d 620, 623 (2001).

## LAW/ANALYSIS

Elders contends the trial court erred in piercing the corporate veil of Elmyer Enterprises and therefore holding him personally liable for the judgment. We disagree.

"At the outset, it is recognized that a corporation is an entity, separate and distinct from its officers and stockholders, and that its debts are not the individual indebtedness of its stockholders." *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 683 (4th Cir.1976). The South Carolina Supreme Court has ruled that the corporate entity may be disregarded in certain situations. *See Baker v. Equitable Leasing Corp.*, 275 S.C. 359, 271 S.E.2d 596 (1980). "However, 'piercing the corporate veil' is not a doctrine to be

applied without substantial reflection." *Baker*, 275 S.C. at 367, 271 S.E.2d at 600. "The corporate form may be disregarded only where equity requires the action to assist a third party." *Woodside v. Woodside*, 290 S.C. 366, 370, 350 S.E.2d 407, 410 (Ct.App.1986). The party asserting the corporate veil should be pierced has the burden of proof. *Id.*

Generally, courts are reluctant to "disregard the integrity of the corporate entity." *Sturkie*, 280 S.C. at 459, 313 S.E.2d at 319.

> If any general rule can be laid down, it is that a corporation will be looked upon as a legal entity until sufficient reason to the contrary appears; but when the notion of legal entity is used to protect fraud, justify wrong, or defeat public policy, the law will regard the corporation as an association of persons.

*Id.* at 457, 313 S.E.2d at 318.

In *Sturkie*, this court set forth a two-pronged test to be used to determine whether to pierce the corporate veil. "The first part of the test, an eight-factor analysis, looks to observance of the corporate formalities by the dominant shareholders. The second part requires that there be an element of injustice or fundamental unfairness if the acts of the corporation be not regarded as the acts of the individuals." *Id.* at 457–58, 313 S.E.2d at 318. The first eight factors were delineated in *Dumas v. InfoSafe Corp.*, 320 S.C. 188, 463 S.E.2d 641 (Ct.App.1995):

> (1) whether the corporation was grossly undercapitalized;
>
> (2) failure to observe corporate formalities;
>
> (3) non-payment of dividends;
>
> (4) insolvency of the debtor corporation at the time;
>
> (5) siphoning of funds of the corporation by the dominant stockholder;
>
> (6) non-functioning of other officers or other directors;
>
> (7) absence of corporate records; and
>
> (8) the fact that the corporation was merely a facade for the operations of the dominant stockholder.

*Dumas*, 320 S.C. at 192, 463 S.E.2d at 644. "The conclusion to disregard the corporate entity must involve a number of the eight factors, but need not involve them all." *Id.* (citing

*Cumberland Wood Prods. v. Bennett,* 308 S.C. 268, 417 S.E.2d 617 (Ct.App.1992)). There is a second prong contained in *Sturkie,* but it need not be reached until and unless the requirements of the first prong are met.

Neither *Sturkie* nor any other case cited by the parties has set forth the weight that must be accorded to each of the eight factors, nor has any case required that each factor be accorded equal weight with the others. Additionally, in applying the eight-factor test of the first prong set out in *Sturkie,* significant changes in basic South Carolina corporate law and federal and state tax law have somewhat complicated the analysis. The ability under state corporate law to adopt and operate under a statutory close corporation status has, as a practical matter, diminished the importance of several of the eight factors. In the same fashion, the ability of corporations to avoid double taxation by adopting S corporation status under federal income tax law has lessened the importance of applying the factor concerning the nonpayment of dividends.

The *Sturkie* factors which now have less importance include the failure to observe corporate formalities, nonfunctioning of other officers or other directors, the absence of corporate records and, as stated above, the nonpayment of dividends. The adoption of the statutory device allowing the creation of a statutory close corporation was designed to lessen the formalities necessary to maintain a corporation. A statutory close corporation may operate without a board of directors,[1] need not adopt bylaws under certain circumstances,[2] and need not hold an annual meeting unless pursuant to a shareholder request.[3] The failure to observe the formality "is not a ground for imposing personal liability on the shareholders for liabilities of the corporation." S.C.Code Ann. § 33–18–250 (1990). Indeed, the official comment to section 33–18–250 notes "the purpose of this section is to eliminate the possible argument that the shareholders in a statutory close corporation are individually liable for the debts and torts of

---

1. S.C.Code Ann. § 33–18–210(a) (1990).

2. S.C.Code Ann. § 33–18–220(a) (1990).

3. S.C.Code Ann. § 33–18–230(b) (1990).

the business because the corporation did not follow the classical model of a corporation." The comment continues:

> This section does not prevent a court from "piercing the corporate veil" of a statutory close corporation if the circumstances should justify imposing personal liability on the shareholders were the corporation not a statutory close corporation. It merely prevents a court from "piercing the corporate veil" because it is a statutory close corporation.

S.C.Code Ann. § 33–18–250 cmt. (1990).

The advent of the statutory close corporation has also had an impact on the type and extent of corporate records required to be maintained and the number and duties of corporate officers and directors. Elders asserts he maintained all necessary corporate records and there were always officers of the corporation.

Although Elders maintained a bare minimum of corporate records, normal business records were definitely lacking in sufficiency. The corporation did not have adequate records of income from the video poker machines or from the operation of the bars. It did not have records of cash receipts, cash expenses, sales, inventory, or other profit and loss statements that normally would be expected.

In the same fashion, although the corporate minutes indicated the election of officers, Elders' niece, who served as secretary-treasurer, stated she did not know she was an officer in the corporation. Elders produced minutes indicating that his wife and niece were present during meetings. However, the niece testified she never attended any corporate meetings.

Admittedly, Elmyer Enterprises was not required to follow the same corporate formalities as a regular business corporation. Although the failure to adhere to these formalities alone cannot be used to pierce the corporate veil, coupling the dearth of corporate business records and the inactivity of other corporate officers with the evidence of substantial siphoning of funds provides evidence upon which the trial court, at least in part, based its decision.

As to the factor concerning the payment or nonpayment of dividends, its importance in the overall scheme of things has

been diminished by the election now allowed by federal tax law. Elders asserts that because the corporation elected to operate as an S corporation pursuant to 26 U.S.C. §§ 1361–1399 (2002), the failure to pay dividends should not be considered a factor against it in determining whether to pierce the corporate veil. We agree, because the net income of the corporation would be passed to the shareholders in direct proportion to their ownership percentage. However, at the same time, this lessens the importance of this factor.

 The corporation was originally funded with only $2,000, which represented $1,000 for each of the two operating locations. Elders asserts that the corporation was properly capitalized at all times, even though the capitalization never appeared to increase over time.

One fact which all the authorities consider significant in the inquiry, and particularly so in the case of the one-man or closely-held corporation, is whether the corporation was grossly undercapitalized for the purposes of the corporate undertaking. See DeWitt, 540 F.2d at 685. The Fourth Circuit Court of Appeals continued: (t)he obligation to provide adequate capital begins with incorporation and is a continuing obligation thereafter * * * during the corporations operations. Id. (quoting Gillespie, The Thin Corporate Line: Loss of Limited Liability Protection, 45 N.D. L. Rev. 363, 377–8 (1969)). An obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, has frequently been an important factor in cases denying stockholders their defense of limited liability. Anderson v. Abbott, 321 U.S. 349, 362, 64 S.Ct. 531, 88 L.Ed. 793 (1944).

The corporation's initial funding was minimal at best. However, as an ongoing concern, the corporation was not properly capitalized. The corporation appeared to have a sufficient cash flow from the bar as well as the video poker machines to continue experiencing growth throughout the life of the corporation. However, no evidence was produced showing that that growth was ever reflected in the corporation's capital account.

Additionally, as Professor Freeman testified, a corporation established for the purpose of serving alcohol has more inherent risks and should be adequately protected from liability associated with those risks. The failure to properly protect

the business and others should be considered when determining whether the corporation is properly capitalized. Accordingly, we hold Elmyer Enterprises failed to remain properly capitalized as an ongoing business.

■ The factors dealing with undercapitalization, siphoning of funds, and whether the corporation was a facade for its dominant shareholder are closely related. The trial court found Elders siphoned substantial funds from the corporation, and the evidence substantiates this finding. Using documents from the corporation, the forensic accountant testified there was a significant amount of income not reported, and she determined that Elders siphoned $400,000 to $800,000 from Elmyer Enterprises over a three-year period. Even though the corporation was able to pay its debts and thereby escape the classical definition of insolvency, the evidence indicates that Elders left in the till only so much as was necessary to pay basic expenses.

The trial court found Elders lacked credibility in his explanations for the difference in the income and what was reported. The court specifically found the money was never accounted for and must have been siphoned by Elders. This is additional evidence that the corporation was used as a mere facade for the benefit of the dominant shareholder, justifying the ultimate conclusion reached by the trial court.

We therefore agree with the trial court that a sufficient number of the eight *Sturkie* factors were present to justify moving to the second prong of the analysis.

■ The second prong of the *Sturkie* test, requiring "that there be an element of injustice or fundamental unfairness if the acts of the corporation be not regarded as the acts of the individuals," *Sturkie*, 280 S.C. at 457–458, 313 S.E.2d at 318, is perhaps more elusive. In *Sturkie*, the court stated:

> The burden of proving fundamental unfairness requires that the plaintiff establish (1) that the defendant was aware of the plaintiff's claim against the corporation, and (2) thereafter, the defendant acted in a self-serving manner with regard to the property of the corporation and in disregard of the plaintiff's claim in the property.

*Id.* at 459, 313 S.E.2d at 319. Later cases clarified the actual knowledge requirement by stating that a person is "aware" of a claim against the corporation if he has notice of facts which, if pursued with due diligence, would lead to knowledge of the claim. *Multimedia Publ'g of South Carolina, Inc. v. Mullins,* 314 S.C. 551, 554, 431 S.E.2d 569, 572 (1993). Most recently this court has held that "the essence of the fairness test is simply that an individual businessman cannot be allowed to hide from the normal consequences of carefree entrepreneuring by doing so through a corporate shell." *Dumas,* 320 S.C. at 193, 463 S.E.2d at 644.

There is evidence that indicates Elders knew of the plaintiff's claim against the corporation and that, as the trial court found, he nevertheless acted in a self-serving and unfair manner by siphoning off substantial sums of money, commingling and transferring assets which he held in his own name to different entities, transferring stock in the corporation to other individuals without a valuable consideration, and then finally dissolving the corporation.

Elders submits there is no evidence he intended to avoid the *normal* consequences of his entrepreneurial adventures. However, the "normal" consequences of operating a bar which, at least in this instance, admittedly served alcohol to an already-intoxicated individual, transcends that which would be considered normal consequences for the average entrepreneurial endeavor.

Finally, Elders submits that even if the corporate veil of Elmyer is pierced and he is held individually liable, he should not be responsible for the interest that has so far accrued on the debt against the corporation. We disagree.

South Carolina Code Ann. 34–31–20(B) (Supp. 2003) states that money decrees and judgments of courts enrolled or entered shall draw interest. [A] claimant is entitled to interest from the date of the rendition of the verdict, or post-judgment interest, as a matter of course. *Calhoun v. Calhoun,* 339 S.C. 96, 102, 529 S.E.2d 14, 18 (2000). The running of post-judgment interest further encourages judgment debtors to pay judgments promptly. *Casey v. Casey,* 311 S.C. 243, 245, 428 S.E.2d 714, 716 (1993).

In general, a corporation and a shareholder are separate and distinct, and the debts of the corporation are not the debts of the shareholder. However, when the corporate veil is pierced, the corporation and the individual become one and the same. *See DeWitt,* 540 F.2d at 683. As they are identical, the liabilities of the corporation are the liabilities of the shareholder. This would include the judgment awarded against the corporation as well as post-judgment interest from the time of the original judgment against the corporation. If post-judgment interest were not included, there would be no penalty for failing to pay until after a subsequent trial regarding piercing the corporate veil. Accordingly, Elders should be held responsible for the post-judgment interest attributable to the corporation.

**AFFIRMED.**

HOWARD and KITTREDGE, JJ., concur.