649 S.E.2d 135

MID–SOUTH MANAGEMENT COMPANY INCORPORATED And William C. Buchheit Trust A, as Partners Of Spartanburg Beach Cove Associates, a General Partnership and a Joint Venturer Of Beach Cove Associates Joint Venture, And Beach Cove Associates Joint Venture, Appellants,

v.

SHERWOOD DEVELOPMENT CORPORATION, a Joint Venturer of Beach Cove Associates Joint Venture; Coastal Financial Corporation, Coastal Federal Savings Bank; Coastal Mortgage Bankers and Realty Co., Inc.; John Doe, which represent unidentified shareholders of Sherwood Development Corporation; Michael C. Gerald and James T. Clemmons, Respondents.

No. 4271.

Court of Appeals of South Carolina.

Heard Dec. 7, 2006.

Decided June 29, 2007.

Rehearing Denied Aug. 24, 2007.

590

Michael B.T. Wilkes and D. Alan Lazenby, of Spartanburg, Michael Warner Battle, of Conway, for Appellant.

Robert E. Stepp, and Amy Hill, of Columbia, for Respondents.

PER CURIAM.

Mid–South Management Company, Inc., William C. Buchheit Trust A, and Beach Cove Associates Joint Venture (collectively, "Appellants"), appeal from the master-in-equity's order finding the parent companies of Sherwood Development Corporation were not liable to pay Appellants' judgment against Sherwood. We affirm.

## FACTS

Spartanburg Beach Cove Associates is a general partnership with Mid–South and the William C. Buchheit Trust A as its majority partners. Spartanburg and Sherwood formed a Joint Venture, Beach Cove Associates Joint Venture. Spartanburg had two-thirds interest in the Joint Venture and Sherwood had the remaining one-third interest.[1] All income and expenses of the Joint Venture were to be allocated in accordance with the parties' percentage interest. The sole purpose of the Joint Venture was to develop a multi-unit condominium complex in Myrtle Beach.

Sherwood was incorporated by James Clemmons and Mike Gerald, president of Sherwood, as a wholly-owned subsidiary of Coastal Mortgage Bankers and Realty Company, Inc. Coastal Mortgage is the wholly owned subsidiary of Coastal Federal Savings Bank, which is the wholly owned subsidiary of Coastal Financial Corporation.

Sherwood was initially capitalized with $10,000, and had no liabilities at its inception. This was sufficient capital to cover the initial investment into the Joint Venture as required by the Joint Venture agreement. Additionally, Coastal Federal provided the financing for the acquisition of the land and construction by the Joint Venture. Sherwood maintained an active board of directors which held routine meetings in order to conduct the business of the corporation. However, the officers and directors of Sherwood were also in various posi-

---

1. When the Joint Venture was originally established, a third entity, Beach Cove Development Corporation, was also involved. The original division of ownership was one-half to Spartanburg, and one-fourth to each Sherwood and Beach Cove Development. However, at all times relevant to this appeal, the only two members of the Joint Venture were Spartanburg and Sherwood.

tions of its parent companies and the company did not maintain separate offices. While Sherwood failed to have its own employees, the Joint Venture contracted with others to provide services. Finally, Sherwood maintained minutes of the board meetings and appropriate financial records, which were independent of its parent companies.

The Joint Venture acquired the property and constructed the condominiums in accordance with the Joint Venture agreement. The parties entered into the project believing it would be profitable and would be able to sustain its own operations. However, the project lost at least $7-8 million, of which Sherwood was responsible for one-third. Sherwood contributed approximately $2.5 million to the Joint Venture as capital calls were made in order to cover the losses generated by the project. The money provided for these capital calls came from Coastal Mortgage. Coastal Mortgage either purchased shares of treasury stock or provided debt funding for Sherwood to continue in operation.

In 1990, S.M. Johnson expressed his interest in purchasing the commercial operations of the Joint Venture as well as undeveloped land owned by the Joint Venture. In a letter to Vickie Myers, a representative of Spartanburg and the accountant for the Joint Venture, Gerald explained that selling may be in the Joint Venture's best interest. Additionally, Gerald explained: "A major area of concern for our Board is the recently enacted banking legislation which necessitates the divestiture of this type of investment by financial institutions. Therefore, Sherwood Development Corporation may, if operating deficits continue, find that it is incapable of supporting the hotel operation further." The deal to sell the commercial operations and property was not approved at that time.

In 1991, Delmar Jones was hired to act as property manager for the condominium project. He had discussions with the homeowners' association board members regarding complaints and problems with water intrusion. However, Jones was unclear about whether he ever reported the problems to the Joint Venture, Sherwood, or any of Sherwood's representatives. Additionally, Jones believed any problems with water intrusion in the common areas was the problem of the homeowners' association and not the Joint Venture.

Gerald was told in late 1992 by Jack Cochrane, president of the homeowners' association, that the association had hired an attorney to look into problems related to the parking garage. In addition, Cochrane stated the attorney "would look around and see if he could make that $200,000 case more like a $2 million case."

In February of 1993, the Joint Venture sold the commercial portion of the venture and some undeveloped property to S.M. Johnson. The proceeds from the sale were approximately $1 million. Sherwood received a distribution from the Joint Venture of approximately $330,000 for its one-third share of the proceeds. Spartanburg received the remainder. Sherwood did not pay dividends with the money, but it instead utilized that money to repay debt owed to Coastal Mortgage from its previous capital contributions to the Joint Venture. Spartanburg also made a distribution of its portion of the proceeds to its partners. Neither Sherwood, Spartanburg, nor anyone associated with the Joint Venture proposed setting aside any of the money in a reserve for future capital requirements.

In August 1993, the homeowners' association brought suit against, among others, the Joint Venture, seeking damages resulting from the stucco application and water intrusion. As a result, the Joint Venture hired counsel, who began negotiating a possible settlement. Sherwood maintained that it believed the partners of the Joint Venture should not be responsible for payment of any of the settlement. However, Sherwood offered $100,000 towards settlement if the offer was also approved by Coastal Mortgage.

Spartanburg instructed counsel the joint venture would contribute up to $1,000,000 to settle the suit. Counsel was able to settle the suit for a total of $5,450,000. Numerous other defendants and insurance policies contributed to the settlement amount. The Joint Venture was ultimately responsible for $835,000, which was paid by a check drawn on Mid–South Management, one of Spartanburg's partners. Spartanburg declined Sherwood's offer of contributing $100,000 toward the settlement.

After Sherwood refused to pay a capital call for its portion of the settlement amount, Appellants brought suit against

Sherwood and its parent companies seeking to recover Sherwood's portion of the settlement. After the trial was bifurcated, Sherwood was found liable for one-third of the settlement amount pursuant to the Joint Venture agreement.[2] The second phase of the trial was to determine whether Sherwood's parent companies or individual officers should be liable for the judgment obtained against Sherwood.

Appellants proffered three main theories seeking to hold Sherwood's parent companies liable: the alter-ego or instrumentality theory, the amalgamation of interest theory, and piercing the corporate veil. At the trial, Appellants offered the testimony of Dr. Oliver Wood, a professor at the University of South Carolina, as an expert to show Sherwood was undercapitalized and operated as an instrument or façade for its parent companies. Additionally, Dr. Wood testified that all reported accounting indicated that Sherwood was consolidated with its parent companies for reporting purposes. Finally, Appellants showed that Sherwood had no employees, and the officers and board members were all involved with Sherwood's parent companies in addition to Sherwood.

Sherwood presented the testimony of Professor John Freeman as its expert. Professor Freeman testified that he believed Sherwood was adequately capitalized and protected by insurance given the nature of its business. In addition, he explained that Sherwood was not established as a sham, but for legitimate business reasons of reducing risk and exposure to liability. He testified there was nothing improper in the way Sherwood was run, the method of reporting and recording Sherwood's activities, or in the manner in which Sherwood operated. With regard to the repayment of the loan to the parent company, Professor Freeman stated, "There's nothing wrong with using some of your cash to pay down your debt.... Even if the debt is to your parent corporation."

The master found piercing the corporate veil was the only theory recognized in South Carolina upon which Appellants could receive relief. The court found the alter-ego or instrumentality theory and the amalgamation of interest theory

2. This court upheld the master's order in *Mid–South Mgmt. Co. v. Sherwood Dev. Corp.,* Op. No.2004–UP–611 (S.C. Ct.App. filed Dec. 7, 2004).

were reserved for specific circumstances, not present in this case. Finally, the master found Appellants failed to demonstrate that Sherwood's corporate veil should equitably be pierced. Accordingly, the master found Sherwood's parent companies were not liable for the judgment against Sherwood.[3] This appeal followed.

## STANDARD OF REVIEW

"An action to pierce the corporate veil is one in equity. Thus this court may take its own view of the preponderance of the evidence." *Dumas v. InfoSafe Corp.*, 320 S.C. 188, 192, 463 S.E.2d 641, 643 (Ct.App.1995); *see Sturkie v. Sifly*, 280 S.C. 453, 456–57, 313 S.E.2d 316, 318 (Ct.App.1984) (finding that an action to pierce the corporate veil is one in equity and the appellate court takes its own view of the preponderance of the evidence). "The broad scope of review applicable to appeals in equity actions does not, however, require an appellate court to disregard the findings below or ignore the fact that the trial judge is in the better position to assess the credibility of the witnesses." *Hunting v. Elders*, 359 S.C. 217, 223, 597 S.E.2d 803, 806 (Ct.App.2004), *cert. dismissed* (Oct. 5, 2005).

## LAW/ANALYSIS

Appellants contend the master erred in not finding Sherwood's parent companies liable for the judgment Appellants obtained against Sherwood. Appellants assert Sherwood's parent companies should be liable because: (1) Sherwood's corporate veil should be pierced; (2) Sherwood was the mere instrumentality or alter-ego of the parent companies; or (3) the amalgamation of corporate interests, entities, and activities blurs the legal description between the corporations and their activities. We disagree.

---

**3.** The master also found that individual officers Michael Gerald and James Clemmons were not liable for the judgment against Sherwood. Appellants have not raised any issue on appeal regarding the liability of the individual officers for the judgment. As a result, that portion of the master's order finding the individual officers were not liable is the law of the case. *See Charleston Lumber Co. v. Miller Housing Corp.*, 338 S.C. 171, 175, 525 S.E.2d 869, 871 (2000) (finding that an unappealed ruling, right or wrong, is the law of the case and requires affirmance).

## I. Piercing the Corporate Veil

█ Appellants maintain the master erred in failing to pierce Sherwood's corporate veil and finding the parent companies liable for Sherwood's obligations. We find Appellants have failed to prove the necessity for piercing the corporate veil of Sherwood.

█ It is generally recognized that a corporation is an entity that is separate and distinct from, and its debts are not the individual debts of, its officers and stockholders. *Hunting*, 359 S.C. at 223, 597 S.E.2d at 806 (*citing DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 683 (4th Cir.1976)). Although the corporate entity may be disregarded in some situations, piercing the corporate veil is not a doctrine to be applied without substantial reflection. *Baker v. Equitable Leasing Corp.*, 275 S.C. 359, 367, 271 S.E.2d 596, 600 (1980) ("However, 'piercing the corporate veil' is not a doctrine to be applied without substantial reflection."). Courts are generally reluctant to disregard the corporate entity:

> If any general rule can be laid down, it is that a corporation will be looked upon as a legal entity until sufficient reason to the contrary appears; but when the notion of legal entity is used to protect fraud, justify wrong, or defeat public policy, the law will regard the corporation as an association of persons.

*Sturkie*, 280 S.C. at 457, 313 S.E.2d at 318. Thus, courts generally disregard the corporate entity only where equity requires piercing the corporate veil to assist a third party. *Woodside v. Woodside*, 290 S.C. 366, 370, 350 S.E.2d 407, 410 (Ct.App.1986) ("The corporate form may be disregarded only where equity requires the action to assist a third party."). The burden of proof is on the party asserting that the corporate veil should be pierced. *Id.*

█ Our courts have outlined a two-prong test to determine whether a corporate veil should be pierced. The first part of the test requires an eight-factor analysis and looks to observance of the corporate formalities by the dominant shareholders. *Sturkie*, 280 S.C. at 457–58, 313 S.E.2d at 318. "The second part requires that there be an element of injustice or fundamental unfairness if the acts of the corporation be

not regarded as the acts of the individuals." Id. In determining whether the corporate formalities were observed under the first prong of the *Sturkie* test, the courts consider eight factors:

(1) whether the corporation was grossly undercapitalized;

(2) failure to observe corporate formalities;

(3) non-payment of dividends;

(4) insolvency of the debtor corporation at the time;

(5) siphoning of funds of the corporation by the dominant stockholder;

(6) non-functioning of other officers or directors;

(7) absence of corporate records; and

(8) the fact that the corporation was merely a façade for the operations of the dominant stockholder.

*Dumas,* 320 S.C. at 192, 463 S.E.2d at 644. "The conclusion to disregard the corporate entity must involve a number of the eight factors, but need not involve them all." Id.[4]

▮▮▮ Under the second prong of the *Sturkie* test, the party seeking to pierce the corporate veil must prove injustice or fundamental unfairness if the corporate veil is not pierced. *Multimedia Publ'g of S.C., Inc. v. Mullins,* 314 S.C. 551, 553, 431 S.E.2d 569, 571 (1993). "The essence of the fairness test is simply that an individual businessman cannot be allowed to hide from the normal consequences of carefree entrepreneuring by doing so through a corporate shell." Id. at 556, 431 S.E.2d at 573.

## A. Corporate Formalities

Reviewing the eight factors to be considered in the first prong of the *Sturkie* test, we find Appellants did not meet their burden of proving that Sherwood failed to observe corporate formalities. Sherwood was able to meet all capital calls totaling approximately $2.5 million, it observed corporate

---

4. Although Sherwood was not a statutory close corporation, this court has recently noted that the statutory creation of such an entity, designed to lessen the formalities necessary for a corporation, has lessened the importance of some of the *Sturkie* factors, including: the failure to observe corporate formalities; the nonfunctioning of other officers or other directors; the absence of corporate records; and the nonpayment of dividends. *Hunting,* 359 S.C. at 225, 597 S.E.2d at 807.

formalities by having meetings and keeping records, it had functioning officers and directors, and, although it did not have the money to pay its portion of the settlement at the time of this action, there is no evidence that Sherwood was insolvent because it did not have any outstanding debt nor was it otherwise unable to seek additional funding from its parent companies. The repayment of the loan to the parent corporations out of the sole distribution to Sherwood did not amount to the "siphoning" of funds. There was no evidence that Sherwood was "merely a façade" for the parent companies. The failure of Sherwood to pay dividends to its shareholders did not amount to fraudulent behavior where the Joint Venture never made a profit and the sole distribution was used to repay a debt to the parent companies. Accordingly, Appellants failed to prove Sherwood did not observe corporate formalities.

### B. Fundamental Unfairness

Even assuming Sherwood failed to observe corporate formalities, Appellants failed to prove that failure to pierce the corporate veil would result in fundamental unfairness.

The heart of a piercing the corporate veil dispute lies in proving the second prong of the *Sturkie* test, which requires a showing of fundamental unfairness in recognizing the corporate entity. The main purpose of piercing the corporate veil is to prevent the likelihood of injustice or unfairness if the limited liability enjoyed by the corporate entity is sustained. *Sturkie*, 280 S.C. at 458–59, 313 S.E.2d at 318. The burden of proving this fundamental unfairness requires the plaintiff to "establish that (1) the defendant was aware of the plaintiff's claim against the corporation, and (2) thereafter, the defendant acted in a self-serving manner with regard to the property of the corporation and in disregard of the plaintiff's claim in the property." *Dumas*, 320 S.C. at 192, 463 S.E.2d at 644. The actual knowledge requirement has been clarified to mean that a person is " 'aware' of a claim against the corporation if he has notice of facts which, if pursued with due diligence, would lead to knowledge of the claim." *Hunting*, 359 S.C. at 229, 597 S.E.2d at 809.

First, we must determine the "plaintiff's claim" that is at issue in this action. Appellants assert the "claim" is the likelihood of damages resulting from the potential suit by the homeowners and Sherwood should have taken steps to insure any judgment received by the homeowners could be covered. Sherwood, on the other hand, contends the "claim" is the request by Spartanburg for contribution of money to satisfy Sherwood's one-third liability for the amount the Joint Venture was required to pay to settle the homeowners' claims. Much of the litigation and the Record on Appeal are devoted to attempting to show what Sherwood knew, should have known, or did not know regarding the homeowners' claims and the potential liability from those claims. However, we find based on the clear language used in numerous cases, the claim to be considered is the claim asserted by Appellants and not the claim asserted by the homeowners against the Joint Venture. *See Dumas*, 320 S.C. at 192, 463 S.E.2d at 644 (stating that "the defendant was aware of the *plaintiff's claim* against the corporation") (emphasis added); *Sturkie*, 280 S.C. at 459, 313 S.E.2d at 319 (reviewing the plaintiff receiver's claim against the corporation).

Based on the record before us, Sherwood would have been aware of Appellants' claims no earlier than when the Joint Venture agreed to pay $835,000 towards settlement of the homeowners' lawsuit. The settlement was reached on February 3, 1997. Prior to this time, Sherwood was under a belief that there would be no requirement of contribution from the Joint Venture and that insurance and other parties would be responsible as had previously taken place when a similar subsidiary of Coastal was involved in a lawsuit and was not responsible for payment of any damages. At the time of the settlement, Sherwood should have known that it would be responsible for one-third of the resulting settlement amount.

The record is devoid of any evidence of self-serving behavior on the part of Sherwood after February 1997. Nothing in the record indicates Sherwood transferred money, property, or other assets out of the corporation after February 1997. Spartanburg knew of Sherwood's resistance to contributing to any proposed settlement based on Sherwood's belief that insurance and other parties should be responsible. In addi-

tion, Spartanburg turned down a $100,000 proposed payment by Sherwood, contingent on approval by Coastal Mortgage.

As to any unfairness, we find Appellants knew at all times that Sherwood was a corporation and enjoyed limited liability. Myers testified that she dealt with Sherwood and not any of the parent companies. Sherwood had previously warned Appellants that it may be forced to cease operations if the operating deficits continued to accrue. This is not a case in which the defendant acted in bad faith or with deceit to take advantage of the plaintiff. The Joint Venture was a business deal among sophisticated parties, and Sherwood contributed over $2 million to the venture due to its continuous losses. Accordingly, we find there is no evidence in the record demonstrating any fundamental unfairness resulting from recognizing the limited liability given to Sherwood as a corporation.

However, even assuming Appellants are correct that the "claim" in this case was the likelihood of the Joint Venture being liable to the homeowners, we find Sherwood was not aware of the claim until the suit was filed in August 1993. As discussed in the facts above, Gerald was notified sometime in the fall of 1992 by the homeowners' association that it hired an attorney due to defects with the parking garage. However, the uncontroverted evidence by Gerald was that he thought the issue with the parking garage was being resolved. In addition, he was told that the attorney for the homeowners' association planned to look around and see "if he could make that $200,000 case more like a $2 million case." However, nothing in this statement would put Gerald or Sherwood on notice of the upcoming lawsuit over stucco and water intrusion damage. Gerald testified that when he received the complaint in August 1993, he was shocked, and it was the first time he had any knowledge of the homeowners' specific allegations.

Appellants attempt to argue Sherwood's self-dealing and unfair behavior was the transfer of the $330,000 from Sherwood to its parent company to repay a debt sometime after March 1993. Appellants maintain Sherwood acted improperly by not setting aside an amount in reserve for the potential homeowners' litigation. However, the testimony by Gerald and Myers reveals that no one from Spartanburg or the other Appellants ever discussed setting up a reserve with the pro-

ceeds received from the commercial sale. In addition, Spartanburg distributed its share of the proceeds to its partners and made no attempt to establish a similar reserve that it now demands Sherwood should have done. We find Appellants have presented insufficient evidence that Sherwood acted in a self-serving manner with regard to the property of the corporation and in disregard of Appellants' claim in the property.

Again, Appellants have failed to demonstrate the unfairness resulting from recognizing the corporate entity in order to pierce the corporate veil of Sherwood, even considering the transfer of the $330,000 to its parent company. As discussed above, these are sophisticated parties who entered into a risky development with the expectation of making a profit that ended in the reality of significant losses.

Regardless of the date of the "claim" against Sherwood, we find Sherwood and its parent companies did not act in a self-serving or unfair manner. We agree with the master in this case that no injustice or fundamental unfairness results from allowing Sherwood to maintain its corporate status and its shareholders to enjoy the limited liability that accompanies being part of a corporation.

## II. Other Grounds

Appellants aver that Sherwood's parent companies should also be held liable under either: (1) an alter-ego or instrumentality theory; or (2) an amalgamation of interest or blurred identity theory. We disagree.

### a. Alter–Ego or Instrumentality Theory

Appellants maintain the master committed error by failing to recognize that Sherwood was the mere instrumentality of its parent companies and in failing to find the parent companies, therefore, liable for Sherwood's debts. We disagree.

Our supreme court has recently addressed the application of the alter-ego theory in *Colleton County Taxpayers v. School District of Colleton County*, 371 S.C. 224, 237, 638 S.E.2d 685, 692 (2006). In that case, a non-profit corporation was created by the Colleton County School District to raise funds for renovating existing public school facilities. In determining

whether the corporation was the alter-ego of the school district, and thus, subject to the general obligation debt limit imposed on school districts by the South Carolina Constitution, the court stated:

> An alter-ego theory requires a showing of total domination and control of one entity by another and inequitable consequences caused thereby. *Peoples Fed. Sav. & Loan Assoc. v. Myrtle Beach Golf & Yacht Club*, 310 S.C. 132, 148, 425 S.E.2d 764, 774 (Ct.App.1992). Control may be shown where the subservient entity manifests no separate interest of its own and functions solely to achieve the goals of the dominant entity. Id. However, this theory does not apply in the absence of fraud or misuse of control by the dominant entity which results in some injustice. *Id.*

*Colleton County Taxpayers*, 371 S.C. at 237, 638 S.E.2d at 692. The *Colleton County* court went on to reference *Baker v. Equitable Leasing Corporation*, 275 S.C. 359, 367–68, 271 S.E.2d 596, 600 (1980), for the theory that control, in and of itself, is not sufficient to find that a subservient corporation is the alter-ego of the dominant one; one must show that the retention of separate corporate personalities would promote fraud, wrong or injustice, or would contravene public policy. *Id.* Noting that there was no evidence of dominance and control, the court found the corporation was not the alter-ego of the school district. *Id.* at 238, 638 S.E.2d at 692.

In the present case, the master found the alter-ego or instrumentality theory was not appropriate for piercing the corporate veil because, up to that point, our courts had only applied the theory when: (1) recognizing the attorney as the alter-ego of the client; (2) determining whether an employer is liable for the bad acts of its employee; and (3) determining lender liability.[5] The master found that the *Sturkie* test for

---

**5.** The master relied upon the following cases in determining what he perceived to be limitations on the application of the alter-ego theory: *Williams v. Williams*, 335 S.C. 386, 391, 517 S.E.2d 689, 692 (1999) (holding that an attorney is the "alter-ego" of his client); *Dickert v. Metro. Life Ins. Co.*, 311 S.C. 218, 220, 428 S.E.2d 700, 701 (1993) (finding that only dominant corporate owners and officers, and not supervisory employees such as an office manager, may be "alter-egos" of employers such that liability falls outside of scope of Workers' Compensation Act and the matter is not one within exclusive province of the Act); and *Peoples Fed. Sav. & Loan Ass'n v. Myrtle Beach Golf &*

piercing the corporate veil was the only way to evaluate corporate structure.

Nothing in the *Colleton County Taxpayers* case limits application of the alter-ego theory solely to the situations listed by the master. In fact, the case cites *Baker*, a veil-piercing case, to support its finding that the alter-ego theory does not apply in the absence of fraud or misuse of control resulting in injustice. *Colleton County Taxpayers*, 371 S.C. at 237, 638 S.E.2d at 692; *see Baker*, 275 S.C. at 367–68, 271 S.E.2d at 600 (noting that piercing the corporate veil is normally only allowed where retaining separate corporate entities would result in fraud, wrong or injustice or would contravene public policy). Although *Colleton County Taxpayers* was decided after the master determined the underlying case and the master did not have the benefit of reviewing it, it appears that the alter-ego theory also applies in corporate situations.

Nevertheless, we find the alter-ego theory is inapplicable to the present case. While Sherwood's officers also held positions in the parent companies, Sherwood maintained separate corporate records. As previously discussed, we find nothing inappropriate about Sherwood's transfer of money to its parent companies to repay a debt. Nothing in the record indicates that the "dominant" companies misused their control over Sherwood to promote fraud. The record reflects that Sherwood was incorporated to limit liability, not to promote fraud. As Professor Freeman testified at the trial, "just because a business fails doesn't mean that there's been fraud." Because there is no evidence in the record to support a finding that Sherwood's parent companies abused their control over Sherwood or that a fraud was committed, the alter-ego theory is inapplicable in the present case. Accordingly, the master did not err in finding the parent companies were not liable for the judgment against Sherwood.

### b. Amalgamation of Interest or Blurred Identity Theory

■ Appellants maintain the court erred in failing to find the parent companies liable under an amalgamation of interest

---

*Yacht Club*, 310 S.C. 132, 148, 425 S.E.2d 764, 774 (Ct.App.1992) (holding that when a lender controls the business decisions and actions of its borrower, the borrower becomes the instrument or alter-ego of the lender).

theory where the companies' interests, entities, and activities blur the identity of the various companies. We disagree.

In *Kincaid v. Landing Development Corporation*, this court found a sibling company liable for the obligation of another sibling company due to the evidence revealing an " 'amalgamation of corporate interests, entities, and activities so as to blur the legal distinction between the corporations and their activities.' " *Kincaid v. Landing Dev. Corp.*, 289 S.C. 89, 96, 344 S.E.2d 869, 874 (Ct.App.1986) (quoting the trial court's order). In *Kincaid*, the Landing Development Corporation (LDC), Resort Management Group, Incorporated (RMG), and Resort Construction Corporation (RCC) were all sibling corporations and were sued for negligent construction and breach of warranty. Id. at 91, 344 S.E.2d at 871. On appeal RMG argued the trial court should have directed a verdict in its favor as it was simply the marketing and sales company. Id. at 96, 344 S.E.2d at 874. However, the *Kincaid* court found the three companies shared officers, shareholders, and location. In addition, the evidence showed RMG was the "project manager" and was the company who the defendant called to attempt to remedy problems. Finally, company letterhead said: "Resort Management Group Inc.," with a notation, "A Development, Construction, Sales, and Property Management Company." *Id.*

In *Kincaid*, this court found sibling companies jointly liable for negligent construction. *Kincaid* was not a situation in which one company owed a judgment and the court imposed liability upon the parent company or a shareholder. Thus, *Kincaid* is inapplicable to the present action.

In addition, there is no evidence in the record that Spartanburg or the other Appellants could confuse Sherwood with its parent companies. At all times, Appellants dealt only with Sherwood and not Coastal Mortgage. Sherwood had separate letterhead and Myers testified she knew she was dealing only with Sherwood and not Coastal Mortgage. Accordingly, even if the *Kincaid* amalgamation of interest theory could be used to find a shareholder liable for debts of a corporation, we find Appellants failed to present sufficient evidence to find Sherwood's parent companies liable for its judgment.

## CONCLUSION

We hold the master correctly found there was no fundamental unfairness in the way Sherwood conducted business and find Appellants failed to prove a sufficient number of the *Sturkie* factors to justify piercing the corporate veil. We further find the alter-ego and amalgamation of interest theories are inapplicable to hold Sherwood's parent companies liable for the judgment given the circumstances of this case. Accordingly, the decision of the master is

**AFFIRMED.**

HEARN, C.J., BEATTY and SHORT, JJ., concur.