735 S.E.2d 459

Robert W. OSKIN, Glenn Small, and Freddie Kanos, Appellants,

v.

Stephen Mark JOHNSON, Michael Brown, Joan Conner Brown and J. Conner, LLC, Respondents.

No. 27187.

Supreme Court of South Carolina.

Heard Feb. 22, 2012.

Decided Nov. 7, 2012.

Michael J. Anzelmo, of Columbia, and Mark Andrew Brunty, of Myrtle Beach, for Appellants.

C. Scott Masel, Danny Villacarlos Butler, and Henrietta U. Golding, all of Myrtle Beach, for Respondents.

Chief Justice TOAL.

Robert W. Oskin, Glenn Small, and Freddie Kanos (collectively "Appellants" or individually by last name) contest the Master-in-Equity's ruling that the assignment of a note and mortgage on a Myrtle Beach property did not violate the South Carolina Fraudulent Conveyance Statute, S.C.Code Ann. § 27–23–10 (2007) (hereinafter the Statute of Elizabeth), and that a payment made to South Carolina Bank & Trust (SCB & T) did not result in a payoff of the amount due under the note and mortgage. We affirm.

### FACTS/PROCEDURAL BACKGROUND

On April 27, 2005, Oskin entered into a contract to broker the sale of Wild Wing Plantation and Golf Course on behalf of Respondent Stephen Mark Johnson (Johnson). The contract obligated Johnson to pay Oskin a finder's fee in the amount of $1 million upon closing. Oskin found a buyer for the property, and the deal was closed on December 15, 2005. Johnson, however, failed to pay the finder's fee, and Oskin brought suit successfully obtaining a judgment against Johnson on December 8, 2008, for breach of contract.

While the breach of contract action was pending, Johnson approached his uncle, Respondent Michael D. Brown (M. Brown), about jointly purchasing an oceanfront lot and home located in Myrtle Beach, South Carolina. On November 30, 2006, Johnson and M. Brown co-signed a $3.5 million promissory note to jointly purchase the property. The term of the note was two years, and it provided for interest-only payments for the first twenty-three months, with a final balloon payment of the entire amount due on November 30, 2008. Title to the property was conveyed to M. Brown and Johnson as tenants in

common. In addition to the SCB & T mortgage, the property was later encumbered in April 2007 by a second mortgage lien in favor of Ameris Bank in the amount of $500,000.[1]

Initially, Johnson made the monthly interest-only payments on the SCB & T note until early 2008 when he could no longer afford to make the payments, at which time M. Brown paid the remaining monthly payments. With the due date on the balloon payment approaching, in October 2008, M. Brown contacted Wachovia Bank (Wachovia) to refinance the SCB & T loan. Because of the Myrtle Beach property's low appraisal value, Wachovia refused to issue the loan unless it was secured with marketable securities worth $3.5 million. In early November 2008, M. Brown approached SCB & T in an attempt to reduce the note balance, but the effort ended in failure.

M. Brown was faced with the following dilemma. M. Brown's nephew was financially unable to pay off the $3.5 million loan they had obtained to buy a house in Myrtle Beach. Because of the recession, the house was appraised at $2.5 to $2.6 million, about $1 million less than the debt. M. Brown was a co-owner and co-obligor on this note. If the note was declared in default and the bank foreclosed, the sale of the Myrtle Beach home would not be sufficient to satisfy the outstanding debt. M. Brown and his wife, Joan Conner Brown, each had extensive security holdings. However, the stock market was also depressed by the economic crisis, and a sale of securities would be at below-value prices.

On November 20, 2008, Joan Conner Brown formed J. Conner, LLC (J. Conner). She used this LLC to obtain the Wachovia loan, which would be used to pay off the debt owed to SCB & T without having to liquidate any of her and her husband's assets. On December 18, 2009, Wachovia approved the loan to J. Conner in the amount of $3.5 million. J. Conner, whose only member was Joan Brown, used the loan proceeds it obtained from Wachovia to purchase the note and mortgage from SCB & T. Wachovia's loan to J. Conner was personally guaranteed by Joan and M. Brown and secured by five investment accounts owned by M. Brown and one by Joan Brown. Joan Brown, on behalf of J. Conner, signed the Certificate of Resolution to Borrow and the Promissory Note.

---

1. The debt to Ameris Bank remained outstanding at the time of trial.

Both Joan and M. Brown jointly signed the Security Agreement. To complete the transaction, Wachovia wired $3.5 million to SCB & T, and M. Brown paid the remaining $44,303.31 due to SCB & T by writing a personal check. After receiving full payment for the purchase of the note, SCB & T assigned the note and mortgage to J. Conner on December 30, 2008.

The assignment of the SCB & T note and mortgage to J. Conner allowed J. Conner to assume SCB & T's priority status as lien creditor. Ameris Bank's $500,000 lien on the property and Oskin's $1,036,000 judgments[2] against Johnson continued to be subordinate to the first lien for $3.5 million obtained by J. Conner.

The parties dispute the motive for the formation of J. Conner and the subsequent assignment of the note. Respondents maintain that they formed J. Conner to enable Joan Brown and her husband to obtain the Wachovia loan and avoid foreclosure without having to liquidate any assets since the SCB & T note was becoming due and the appraised value of the property was less than the amount borrowed. In contrast, Appellants assert that "[t]he only reason J. Conner existed was because [M. Brown] was obligated under the note and mortgage and wanted to avoid the Oskin judgment against Johnson."[3] Appellants claim the transfer between SCB & T and J. Conner was fraudulent under the Statute of Elizabeth. Additionally, Appellants attempt to pierce the corporate veil by asserting that M. Brown is the alter-ego of J. Conner.

---

**2.** In addition, to the $1 million judgment, Oskin also became the holder of a Confession of Judgment in the amount of $36,000 executed by Johnson in favor of David B. O'Connell. Oskin purchased the Confession of Judgment from O'Connell for $500 on November 4, 2009, approximately seven months after the Complaint was filed.

**3.** Appellants allege that J. Conner was formed "as stated by Michael Brown, to protect his property asset from the Oskin judgment." Going directly to the testimony cited, the Record is unclear whether M. Brown actually stated this. When M. Brown was asked whether the "SCB & T note [ ] prompted borrower to seek legal advice in dealing with the *outstanding liens*" to protect his asset, M. Brown answered, "yes." However, "outstanding liens" might refer to the mortgage on the property owed to SCB & T rather than to the Oskin judgment as Appellants allege.

After a bench trial, the Horry County Master ruled against Appellants on all claims, holding: (i) the Statute of Elizabeth did not apply to the assignment of the note and mortgage because M. Brown and J. Conner were never indebted to Appellants, and (ii) even if applicable, the assignment of the note and mortgage did not violate the Statute of Elizabeth because no injustice or fraud was perpetrated on Appellants as a result of the assignment. In addition, the Master held that (iii) the payments to SCB & T for the assignment did not result in a pay-off of the note nor the satisfaction of the mortgage because M. Brown was not the alter-ego of J. Conner and due to a future advances clause, (iv) and even if the payments to SCB & T resulted in a pay-off of the note, M. Brown was equitably subrogated to Johnson's interest in the property to the extent of the monies paid by M. Brown in excess of his one-half share of the obligations on the note. After the Master denied Appellants' Rule 59, SCRCP, motion, Appellants filed a timely appeal. This case is before this Court pursuant to Rule 204(b), SCACR.

## ISSUES

I. Whether the assignment of the note was a fraudulent conveyance in violation of the Statute of Elizabeth.

II. Whether the payment to SCB & T resulted in a pay-off of the note and satisfaction of the mortgage.

## STANDARD OF REVIEW

A clear and convincing evidentiary standard governs fraudulent conveyance claims brought under the Statute of Elizabeth.[4] *Windsor Props., Inc. v. Dolphin Head Constr.*

---

4. Appellants and Respondents relied on dicta in *Future Group, II v. Nationsbank*, 324 S.C. 89, 97 n. 6, 478 S.E.2d 45, 49 n. 6 (1996), to conclude the evidentiary standard for a fraudulent conveyance under the Statute of Elizabeth is a preponderance of the evidence standard. *Future Group* stated in a footnote, "This cause of action is an equitable one and on appeal this Court will find facts in accordance with its own view of the preponderance of the evidence." *Id.* Nevertheless, our decisions superseding and preceding *Future Group* have held that a clear and convincing evidentiary standard applies to fraudulent conveyances under the Statute of Elizabeth, and we reaffirm that standard here. *Windsor Props., Inc. v. Dolphin Head Constr. Co.*, 331 S.C. 466, 471, 498 S.E.2d 858, 860 (1998) (citations omitted); *Gardner v. Kirven,*

*Co.,* 331 S.C. 466, 471, 498 S.E.2d 858, 860 (1998) (citations omitted). An action to set aside a conveyance under the Statute of Elizabeth is an equitable action, and a de novo standard of review applies. *Future Group, II,* 324 S.C. at 97 n. 6, 478 S.E.2d at 49 n. 6; S.C. Const. art. V, § 5.

An action to pierce the corporate veil under an alter-ego theory also lies in equity. *Mid–South Mgmt. Co., Inc. v. Sherwood Dev. Corp.,* 374 S.C. 588, 596, 649 S.E.2d 135, 140 (Ct.App.2007) (citations omitted). Here, the appellate court has jurisdiction to find facts in accordance with its own view of the preponderance of the evidence. *Pinckney v. Warren,* 344 S.C. 382, 387, 544 S.E.2d 620, 623 (2001). However, an appellate court is not required to disregard the findings of fact by the trial court nor ignore the fact that the trial judge is in the better position to assess the credibility of the witnesses. *Id.*

ANALYSIS

## I. Statute of Elizabeth

Appellants claim the assignment of the note was a fraudulent conveyance in violation of the Statute of Elizabeth. We disagree.

The Statute of Elizabeth provides:

Every gift, grant, alienation, bargain, transfer, and convey-ance of lands ... for any intent or purpose to delay, hinder, or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties and forfei-tures must be deemed and taken ... to be clearly and utterly void....

S.C.Code Ann. § 27–23–10(A) (2007).

In interpreting this statute, this Court has held con-veyances shall be set aside under two conditions: First, where there was valuable consideration and the transfer is made by the grantor with the actual intent to defraud; and, second, where a transfer is made without actual intent to defraud but without valuable consideration. *Future Group, II,* 324 S.C.

---

184 S.C. 37, 41, 191 S.E. 814, 816 (1937) ("The law imposes the burden on the transferee to establish both a valuable consideration and the bona fides of the transaction by clear and convincing testimony.").

89, 96, 478 S.E.2d 45, 48–49 (citations omitted); *McDaniel v. Allen,* 265 S.C. 237, 242–43, 217 S.E.2d 773, 775–76 (1975) (citations omitted).

It is undisputed that valuable consideration was paid for the transfer of the note and mortgage in this case. Appellants contend that the purpose and the fraudulent intent of M. Brown was to "structure a transaction relating to the SCB & T note mortgage in order to protect [M. Brown's] interest in the property from being affected by Oskin's judgments against Johnson and to preclude Appellants from executing against the property." We disagree.

■■ The Statute of Elizabeth is concerned with the intent of the grantor who conveys an interest in land.[5] *McDaniel,* 265 S.C. at 242–43, 217 S.E.2d at 775–76 (requiring that the grantor must have an intent to defraud). Here, the grantor who transferred an equitable interest in land to J. Conner was SCB & T, not M. Brown. There are no allegations that SCB & T intended to defraud appellants, and we see no basis for applying the Statute of Elizabeth.[6]

---

5. Even where it is shown that the grantor has fraudulent intent, to "annul for fraud a deed based upon value consideration [under the Statute of Elizabeth], it must not only be shown that the grantor intended to hinder, delay or defraud creditors, but it must also appear that the grantee participated in such fraudulent act." *McDaniel,* 265 S.C. at 242–43, 217 S.E.2d at 775–76.

6. Even assuming arguendo that we set aside the conveyance from SCB & T to J. Conner as fraudulent under the Statute of Elizabeth, Appellants' priority would not change. If this Court were to set aside the conveyance as fraudulent, then the conveyance would be treated as if it never occurred. Thus, SCB & T would continue to hold the note, and Appellants would remain in their position of third priority, behind Ameris Bank. *See generally Windsor Properties,* 331 S.C. at 471, 498 S.E.2d at 860; *Future Group, II,* 324 S.C. at 98, 478 S.E.2d at 49; *Gardner,* 184 S.C. at 41, 191 S.E. at 816. At oral argument, Appellants urged that if this Court sets aside the conveyance, their priority would improve. Appellants reach that end by arguing the SCB & T note would be paid off by the Wachovia loan—the same loan that was lent solely for the purpose of the allegedly fraudulent conveyance. Appellants cite no authorities to support this Court rearranging the priorities of the parties in such a matter. We find Appellants' position is untenable because, in effect, Appellants want to set aside a conveyance as fraudulent, but also benefit from the alleged fraud.

Thus, we hold Appellants failed to establish by clear and convincing evidence that the grantor, SCB & T, transferred the note and mortgage with intent to defraud Appellants.[7] *Windsor Props.*, 331 S.C. at 471, 498 S.E.2d at 860.

## II. Pay-off of Principal Amount Due

The Master found the mortgage was not satisfied because (1) J. Conner is not the alter-ego of the mortgage guarantor, M. Brown; (2) that assuming arguendo that J. Conner is the alter-ego of M. Brown, a future advances clause still precludes a finding that the $3.5 million payment to SCB & T constitutes a pay-off of the note and satisfaction of the mortgage; (3) and even if the payments to SCB & T results in a "pay-off" of the note, Brown's rights and priority would be the same as that of SCB & T before the assignment under equitable subrogation. We agree that the mortgage is not satisfied. J. Conner is not the alter-ego of M. Brown because Appellants have failed to prove that J. Conner was created by fraud, injustice, or in contravention of public policy. Based on this finding, we deem it unnecessary to reach the issue of the future advances clause and equitable subrogation. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (appellate court need not address remaining issues when disposition of prior issue is dispositive).[8]

---

7. Because this is not an intra-family transfer, the burden of proof is on Appellants rather than Respondents. *See* n. 7, *supra*.

8. We do not reach the issue of the future advances clause, and we do not decide whether the mortgage here is a valid open-ended mortgage. However, in cases dealing with valid open-ended mortgages, lest our silence be taken for agreement, we do not concur with the dissent's position that a future advances clause "has no practical effect" if "SCB & T has made no future advances.... and there is nothing for the future advances clause to secure." *Central Production's* statements that "the mortgage did not die" and that it remained "dormant but viable" means plainly that the mortgage is not satisfied even if there is "no debt for it to secure." *Cent. Prod. Credit Ass'n v. Page*, 268 S.C. 1, 8, 231 S.E.2d 210, 214 (1977). To hold otherwise would be contrary to section 29–3–50 of the South Carolina Code, legislative intent, and the express language of *Central Production*. *Id.;* S.C.Code Ann. § 29–3–50 (2007) ("There is nothing express or implied, in the statute to infer that it was the intent of the legislature that the mortgage be dead once *there is no debt momentarily existing....* A holding that an open-end mort-

## Alter–Ego

 Appellants attempt to pierce the corporate veil by contending that J. Conner is the alter-ego of M. Brown, and any payments made by J. Conner to SCB & T, in effect, were payments made by M. Brown resulting in the payoff of the note and satisfaction of the mortgage. We disagree.

 An alter-ego theory requires a showing of (1) total domination and control of one entity by another and (2) inequitable consequences caused thereby. *Colleton Cnty. Taxpayers Ass'n v. Sch. Dist. of Colleton Cnty.*, 371 S.C. 224, 237, 638 S.E.2d 685, 692 (2006). Control may be shown where the subservient entity manifests no separate interest of its own and functions solely to achieve the goals of the dominant entity. *Id.* (citation omitted). This theory does not apply, however, in the absence of fraud, injustice, or contravention of public policy. *Id.* (citations omitted).

We find that even under a preponderance of the evidence standard, the recognition of J. Conner as an entity would not promote fraud, injustice, or contravene public policy. *Id.* Appellants fail to satisfy the required elements of fraud. *See First State Savings & Loan v. Phelps*, 299 S.C. 441, 446–47, 385 S.E.2d 821, 824 (1989) (listing nine elements of fraud). The evidence does not demonstrate any false material repre-

gage dies when there is currently *no debt for it to secure,* would severely limit its beneficial use and defeat the legislative intent.") (emphasis added). Grounds available for lines of credit (future advances in modern parlance) are commonly secured by mortgages. Quite often, the line of credit will sit unused for a considerable period of time. The fact that there is no current credit balance does not discharge the mortgage or the right to draw on the line of credit. Consequently, if the mortgage does not die, then it is not satisfied and thus, has a "practical effect" when the issue of whether a mortgage is satisfied is at stake. *Id.* As to whether the rule stated in *Central Production* promotes "absurdity," we note that the rule has been a bedrock and standard of the mortgage industry for decades. There is no evidence that it has undermined consumer protection or destabilized the industry. To the contrary:

> Mortgages to secure future advances serve a socially and economically desirable purpose. . . . The mortgagor saves interest on the surplus until ready to use it. He also avoids the expense and inconvenience of refinancing the mortgage so as to include the additional needed sum, or, in the alternative, of executing a second and later mortgage for each new advance, with the attendant expenses.

*Cent. Prod.*, 268 S.C. at 7, 231 S.E.2d at 213.

sentation on Respondents' part, and Joan Brown and her husband have no legal or fiduciary relationship with Appellants. *Id.* In addition, no injustice or contravention of public policy resulted from Joan Brown's control of J. Conner. Joan Brown's purpose in creating J. Conner was to secure her and her husband's bona fide claim rather than to defraud Appellants. In the face of collapsing property prices, below-value prices for securities, and an impending balloon payment, Joan Brown and her husband did what was natural to protect their bona fide interest in their property without having to liquidate assets.[9] As with any other wise consumers or investors, they are free to utilize a legal mechanism to protect their own financial interests. There is no inequity or fraud in this instance where the priorities of Appellants do not change, and Appellants are left no worse off than had SCB & T foreclosed on the property.[10] We are cognizant of the fact that entities

---

9. The Record shows that M. Brown and his wife had other reasons beyond Oskin's judgment to structure the transaction as they did. The term of the note was two years, and it provided for interest-only payments for the first twenty-three months, with a final balloon payment due on November 30, 2008. As this due date approached, the value of the property plummeted from $3.5 million to $2.5–2.6 million in the midst of the mortgage foreclosure crisis. Appellants claimed during oral argument that foreclosure is a "red herring," noting that M. Brown never contemplated allowing the property to go into foreclosure. This misses the point. M. Brown had to pay the impending balloon payment somehow whether it was through liquidating assets he owned or through obtaining a loan from a financial institution, or he would face the prospect of foreclosure (whether he contemplated it or not). M. Brown chose not to liquidate any of his own assets and persuaded his wife to form J. Conner to obtain the Wachovia loan. As Jim Boyd and John Lee Scott, respectively bankers from SCB & T and Wachovia Bank, testified, rather than constituting fraud, it was "common business practice" to form an LLC for the purpose of purchasing, holding, and enforcing negotiable instruments.

10. Prior to the assignment, Appellants' judgments were subordinate to the $3.5 million SCB & T first mortgage and the $500,000 second mortgage to Ameris Bank. Due to the low appraisal value and the large mortgage owed, Brown's property was "under water." If the assignment had not occurred, the Browns chose not to liquidate any of their assets, and SCB & T had foreclosed on the note and mortgage, Appellants' interest in the property would have been extinguished because SCB & T had priority. There is no inequity or fraud if the priorities of Appellants do not change. In seeking to set aside the conveyance, we

can use legal mechanisms to achieve fraudulent ends,[11] but weighing the totality of the evidence, we find the preponderance of the evidence does not support Appellants' allegations of fraud, injustice, or contravention of public policy in the face of the Browns' action to protect their bona fide interest in their property.

Thus, we refuse to pierce the corporate veil, and Appellants' alter-ego claim necessarily fails. *See Baker v. Equitable Leasing Corp.*, 275 S.C. 359, 367, 271 S.E.2d 596, 600 (1980) (Rejecting the alter-ego theory because " 'piercing the corporate veil' is not a doctrine to be applied without substantial reflection.").

### CONCLUSION

For the foregoing reasons, we affirm.

**AFFIRMED.**

PLEICONES and BEATTY, JJ., concur.

HEARN, J., concurring in part and dissenting in part in a separate opinion.

KITTREDGE, J., writing a separate opinion.

Justice HEARN.

Respectfully, I concur in part and dissent in part. While I ultimately agree with the majority that the Statute of Elizabeth cannot be invoked to set aside this assignment, I believe the majority adopts too narrow a view of the statute in the process. Furthermore, I disagree with the majority's conclusion that Robert Oskin, Glenn Small, and Freddie Kanos (collectively, Appellants), have not shown that J. Conner, LLC was the alter-ego of Michael Brown. I would therefore hold that J. Conner's payment to South Carolina Bank and Trust (SCB & T) satisfied the note and mortgage.

---

believe Appellants seek a superior priority that they were never guaranteed or necessarily entitled to.

11. *Matthews v. Montgomery*, 193 S.C. 118, 131, 7 S.E.2d 841, 847 (1940).

## I

I first turn to the facts and structure of the transaction under review. Appellants are various holders of judgments against Stephen Mark Johnson. Before Appellants reduced their claims to judgments, Johnson purchased oceanfront property in Myrtle Beach, South Carolina, for $3.5 million. Because Johnson was unable to obtain the necessary financing to purchase the property on his own, Brown, who is Johnson's uncle, agreed to co-sign a note from SCB & T and purchase the property jointly. The term of the note was two years, and the note provided for interest-only payments for the first twenty-three months followed by a final balloon payment. In connection with the note, Brown and Johnson granted SCB & T a first mortgage.[12]

Shortly before the final balloon payment became due, Brown approached SCB & T to inquire about assigning the note and mortgage to him. SCB & T informed Brown that such a transaction was not possible because it would amount to a payoff of the note and nothing would remain to assign. SCB & T also refused to extend the note's term. Out of options, Brown's wife, Joan Conner Brown, formed J. Conner, a limited liability company of which she is the only member, for the sole purpose of acquiring and holding SCB & T's note and mortgage. To accomplish this, J. Conner obtained a $3.5 million loan from Wachovia Bank and used the proceeds to purchase the note and mortgage from SCB & T; title to the property remained in Johnson and Brown. By virtue of this transaction, J. Conner stepped into the shoes of SCB & T and assumed its superior priority position with respect to the property.

By the time Appellants obtained judgments against Johnson, he was insolvent save for this property. However, so long as J. Conner has priority over Appellants, they effectively are precluded from forcing a judicial sale of the property to satisfy their judgments.[13] Seeking a set-aside of the assign-

---

12. The property was later encumbered by a $500,000 second mortgage in favor of Ameris Bank, which also attached prior to Appellants' judgments. This debt remained outstanding at the time of trial.

13. This is a matter of simple mathematics. At the time of the assignment, the property's value was between $2.5 and $2.6 million. The

ment, or a finding that J. Conner was Brown's alter-ego and J. Conner's payment to SCB & T therefore satisfied the note and mortgage, Appellants filed the instant declaratory judgment action against Brown, Joan Conner Brown, Johnson, and J. Conner (collectively, Respondents).

## II

In my opinion, the majority errs by holding we can look only to the intent of a grantor when determining whether the Statute of Elizabeth would set aside a conveyance. While I agree that the vast majority of cases will involve an unscrupulous grantor, I do not believe that we are required to only examine his intent. Instead, I would review the transaction as a whole for whether it was designed to defraud another. Nevertheless, even under this standard I do not believe Appellants have met their burden.

As a threshold matter, I will quickly dispense with Respondents' first argument that the Statute of Elizabeth is inapplicable because it only concerns those in a debtor-creditor relationship. Our codification of the Statute of Elizabeth provides, in pertinent part:

> Every gift, grant, alienation, bargain, transfer, and conveyance of lands ... or other profit or charge [14] out of the same ... which may be had or made to or for any intent or purpose to delay, hinder, or defraud *creditors and others* of their just and lawful ... debts ... must be deemed and taken ... to be clearly and utterly void, frustrate and of no effect, any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.

S.C.Code Ann. § 27–23–10 (2007) (footnote and emphasis added). In *Lebovitz v. Mudd*, 293 S.C. 49, 358 S.E.2d 698 (1987),

---

principal on the note, however, was approximately $3.5 million when it was assigned to J. Conner, and Brown and Johnson have made no payments on it. Thus, even assuming the property fetched its full market value at a judgment sale, every penny of the proceeds would go towards paying off this note and a deficiency would still remain. Nothing would be left for Appellants.

14. A "charge" in this context means "[a]n encumbrance, lien, or claim." Black's Law Dictionary 97 (3d pocket ed.2006).

we expressly held that a debtor-creditor relationship is not necessary to trigger the statute based on the language that it applies to "creditors [*and*] *others.*" *Id.* at 52, 358 S.E.2d at 700. Although I acknowledge that some of our other cases have referred to a debtor-creditor relationship, they are unremarkable because they actually did involve a debtor and a creditor. Nothing in our jurisprudence undermines the validity of *Lebovitz,* and the plain statutory language underpinning that decision has not changed. Respondents' argument therefore is meritless.

The majority holds that the applicability of the Statute of Elizabeth turns on the grantor's intent and not the general intent behind the transaction. This holding, however, suffers from the same flaws as Respondents' first argument. First, the statute contains no such limitation. Instead, it only refers to the intent of the transaction itself, not the specific intent of the grantor. *See* S.C.Code Ann. § 27–23–10 ("Every gift, grant, alienation, bargain, transfer, and conveyance of lands ... or other profit or charge out of the same ... which may be had or made to or for any intent or purpose to delay, hinder, or defraud creditors and others of their just and lawful ... debts...."). Second, just as with *Lebovitz,* the fact that some of our cases discuss the intent of the grantor does not mean his intent controls. Those cases merely demonstrate that the grantor's intent was an issue in them. Instead, it is the language of the statute which controls.

I am wary of judicially engrafting a limitation onto a statute rather than according the statute its plain meaning, especially when doing so has the very real potential to thwart its purpose. *See Gay v. Ariail,* 381 S.C. 341, 344, 673 S.E.2d 418, 420 (2009) ("In interpreting statutes, the Court looks to the plain meaning of the statute and the intent of the Legislature."). It has long been the rule that "[t]he statute 13th of Elizabeth,[15] protecting creditors and others from fraudulent conveyances, is to be construed liberally in favor of the class of persons designed to be protected from fraud." *Gibson v. Love,* 4 Fla. 217, 217 (1851) (emphasis removed, footnote added); *see also Duncan v. Freeman,* 152 Ga. 332, 110 S.E. 5,

---

15. This particular Statute of Elizabeth is commonly referred to as the Statute of 13 (or 13th) Elizabeth because it was enacted during the thirteenth year of Queen Elizabeth I's reign. 13 Eliz. 1, c 5.

6 (1921) ("Although the statute is strict, and even penal, the courts have given a liberal construction to its provisions."). Under the majority's interpretation, an individual can goad an innocent grantor into conveying an interest in property to defraud another with impunity. Despite being the sort of transaction the Statute of Elizabeth was designed to remedy, the majority sanctions it simply because the person perpetrating the fraud was not the grantor. I can see no defensible reason why the very ill sought to be prevented by the Statute of Elizabeth should be perpetuated by virtue of such an unsupported technicality.

I am also not persuaded by Respondents' assertion that Appellants' claim is not viable because the assignment in question was accomplished by legal means and is a common business practice. The facial legality of the conveyance should have no bearing on whether it was intended to defraud another. Suggesting otherwise ignores the reality that entities can use perfectly legal transactions to achieve nefarious ends. Indeed, we have already rejected this very argument:

> If the elements necessary to set aside a transfer for fraud are shown, the legality in other respects of the means by which the design is accomplished affords no defence [sic]. It is the fraudulent purpose and the injurious result, not the form of the transaction nor the illegality or irregularity of the instrument, or the means used for its accomplishment, which render such transactions voidable at the instance of a person injured thereby.

*Matthews v. Montgomery*, 193 S.C. 118, 131, 7 S.E.2d 841, 847 (1940). I accordingly would place no weight on the fact that, on its face, the assignment may have been common business practice and legal.

As to whether Brown actually intended to defraud Appellants or hinder the collection of their judgments, I agree with the majority that Appellants have not met their burden. The heart of Appellants' contention is that Respondents structured the transaction in such a way that a $3.5 million lien with priority over Appellants' judgments would remain on the property. If this result was accomplished, Appellants would, for all intents and purposes, be precluded from collecting. Conversely, if this lien was extinguished and Appellants forced

a sale of the property, Brown would lose most of his investment in a multi-million dollar asset. Thus, the only way Brown could secure his own interest in the property was to ensure Appellants could not execute.

Respondents counter by contending the assignment was done to secure J. Conner's "[b]ona fide claims ... as purchaser of the $3.5 million note and mortgage from SCB & T." This position is untenable, however, because J. Conner only obtained its interest in the note and mortgage through the allegedly fraudulent assignment. In other words, J. Conner had no interest to protect until the assignment took place. Respondents' reliance on *McDaniel v. Allen*, 265 S.C. 237, 217 S.E.2d 773 (1975), to support their contention therefore is unavailing. In *McDaniel*, we found the conveyance of property from husband to wife was not done to defraud the husband's creditors but instead to protect the wife's bona fide interest in the subject property because *she already had one. See id.* at 241–44, 217 S.E.2d at 775–76. J. Conner, in contrast, had no interest it could protect prior to the assignment.

Yet there is evidence that the note and mortgage were assigned to J. Conner in order to protect Brown's investment in the face of a slumping real estate market, not to defraud Appellants. The thrust of the argument is that it is not fiscally responsible to make the SCB & T balloon payment of approximately $3.5 million for an asset worth $2.5–$2.6 million, particularly when Brown would have to suffer further losses when liquidating the assets necessary to complete the payoff. Thus, extending the term of the note by assigning it to a holder simply insulates Brown from the drop in the property's value precipitated by the general decline in the real estate market. However, the transaction undeniably had the concomitant effect of preventing Appellants from collecting on their judgments, and the distinction between protecting one's interest in property in a down market and insulating it from a judgment is tenuous and fraught with precarious implications for judgment holders like Appellants. Still, while I am troubled by many aspects of the assignment, I cannot conclude that Appellants have shown the requisite intent by clear and

convincing evidence.[16] I therefore concur in the result reached by the majority on this issue.

### III

However, I do not join in the majority's conclusion that J. Conner was not Brown's alter-ego.[17] An alter-ego claim "requires a showing of total domination and control of one entity by another." *Colleton Cnty. Taxpayers Ass'n v. Sch. Dist. of Colleton Cnty.*, 371 S.C. 224, 237, 638 S.E.2d 685, 692 (2006). "Control may be shown where the subservient entity manifests no separate interest of its own and functions solely to achieve the goals of the dominant entity." *Id.* Regardless, "this theory does not apply in the absence of fraud or misuse of control by the dominant entity which results in some injustice." *Id.; see also Baker v. Equitable Leasing Corp.*, 275 S.C. 359, 367–68, 271 S.E.2d 596, 600 (1980) (holding that the alter-ego theory should be used only when retaining separate "personalities would promote fraud, wrong, or injustice or contravene public policy").

Turning to the first part of the analysis, J. Conner's operating agreement expressly states its purpose is "to acquire that certain note and mortgage currently held by South Carolina Bank and Trust, N.A. from Michael D[.] Brown and Stephen

---

16. The majority indicates that even if the conveyance was set aside under the Statute of Elizabeth, the error would be harmless because Appellants' priority would not change. I respectfully disagree because while SCB & T would now be the holder of the note, the majority ignores Brown's unequivocal testimony that foreclosure "was never an option" and he was "going to make sure [SCB & T] got paid." Hence, Brown would not suffer foreclosure and the SCB & T note would be paid off in full. With the $3.5 million lien with first priority out of the picture, Appellants would be in a position to realistically recover. Thus, any error in our decision cannot possibly be harmless beyond a reasonable doubt. *See Wells v. Halyard,* 341 S.C. 234, 237, 533 S.E.2d 341, 343 (Ct.App.2000) ("An alleged error is harmless if the appellate court determines beyond a reasonable doubt that the alleged error did not contribute to the verdict.").

17. The alter-ego theory is a means of piercing the corporate veil. *Drury Dev. Corp. v. Found. Ins. Co.,* 380 S.C. 97, 101 n. 1, 668 S.E.2d 798, 800 n. 1 (2008). Piercing the corporate veil of an LLC has not yet been recognized in this State, however. Nevertheless, because neither the majority, the parties, nor the master raise this question, I will discuss Appellants' alter-ego claim assuming *arguendo* it applies.

Mark Johnson and secured by that certain mortgage of the same date." True to this purpose, the note and mortgage are the only assets of J. Conner. Moreover, Brown testified that J. Conner never would have been organized but for the need to assign the note away from SCB & T. In fact, J. Conner was created right after SCB & T rebuffed Brown's attempt to assign the note to himself. J. Conner therefore exists solely to do what Brown himself could not do: hold the note.[18]

As to whether this arrangement would promote fraud or injustice, the fact that Appellants may have failed to prove intent to defraud or hinder by clear and convincing evidence has no bearing on whether they have shown fraud or injustice by a preponderance of the evidence, as required here. *See Mid–S. Mgmt. Co. v. Sherwood Dev. Corp.,* 374 S.C. 588, 596, 649 S.E.2d 135, 140 (Ct.App.2007) (applying preponderance of the evidence standard to veil piercing claim). Although the evidence may not be clear and convincing, I believe the preponderance of the evidence shows J. Conner was formed to ensure a $3.5 million lien retained first priority on the property. This would keep Appellants from forcing a sale of it and thereby prevent Brown from losing his investment. This orchestrated effort to prevent the collection of valid judgments is a clear injustice. Moreover, as explained above, Appellants' priority was affected by the assignment and it is of no moment that the means used were facially legal or a common business practice.

For those reasons, I would hold that J. Conner was the alter-ego of Brown. Thus, J. Conner's payment to SCB & T was, in actuality, a payment by Brown. As a co-obligor of the note, this payment should have satisfied it. *See* S.C.Code Ann. § 36–3–602(b) (Supp.2011). There still remains a question, however, of whether Brown also would have been able to satisfy the *mortgage* due to a future advances clause in it.

---

18. Respondents also argue Appellants' alter-ego claim fails because J. Conner's only member is Brown's wife and, incredibly, she is "an independent woman." Respondents' ascription of relevance to any independence Joan Conner Brown may have had is specious. Even if she did have the financial and personal wherewithal to be independent, that is irrelevant because J. Conner was formed solely to protect one of Brown's assets, not one of hers. Moreover, it completely ignores the fact that a wife, irrespective of her own assets, has an interest in her husband's financial well-being.

The mortgage Brown and Johnson granted SCB & T provides, "The lien of this Security Instrument shall secure the existing indebtedness under the Note and any future advances made under this Security Instrument." Relying on our decision in *Central Production Credit Ass'n v. Page*, 268 S.C. 1, 231 S.E.2d 210 (1977), Respondents argue the mere presence of a future advances clause precludes a finding that the mortgage is satisfied and prevents Appellants from collecting on their debts. I do not believe the future advances clause has any bearing on this case.

In *Central Production*, we held that a future advances clause meant "the mortgage did not die" once the initial debt was discharged, and thus it remains "dormant but viable." *Id.* at 8, 231 S.E.2d at 214. Accordingly, the mortgage in question was able to secure funds loaned after the debtor paid off the original debt in full. *Id.* Here, SCB & T has made no future advances. Hence, at this point in time, there is nothing for the future advances clause to secure. Unless and until SCB & T loans additional funds, the clause simply has no practical effect even though the mortgage technically is not satisfied. This is so because while SCB & T may have first priority, it is entitled to no money and therefore just steps out of Appellants' way if they foreclose on their judgment liens. A future advances clause can only reduce the amount available for other creditors when a lender actually loans money under the clause and there is an outstanding balance at the time of sale. Because that has yet to happen here, any failure to satisfy the mortgage due to the future advances clause has no bearing on the present case.

Although the majority professes to not reach this question, it strenuously disagrees that such a mortgage has no effect. The majority's theme is that my conclusion is contrary to *Central Production* and the statute specifically permitting these clauses, Section 29–3–50 of the South Carolina Code (2007). However, in my opinion, *Central Production* was correctly decided and remains good law, and these clauses are an essential tool for many business and individuals. However, that does not change the fact that a dormant-yet-viable mortgage which *secures nothing* has no practical effect when the property is sold. Nothing in either *Central Production* or section 29–3–50 says otherwise. By giving the clause efficacy

in these situations, a debtor can maintain a zero-balance mortgage with a future advances clause on property in order to completely prevent junior lienholders from ever collecting.[19] In my view, the absurdity of concluding a dormant mortgage which secures no debt reduces the amount available for junior creditors is obvious. I cannot in good conscience join in such a result, especially under our equity jurisdiction.

In any event, the majority erroneously overlooks the fact that the future advances clause cannot apply here due to the terms of the agreement. SCB & T's mortgage secures "the existing indebtedness under the Note and any future advances made under this Security Instrument." The agreement further provides, however, that "[u]pon payment of all sums secured by this Security Instrument, this Security Instrument shall become null and void. Lender shall release this Security Instrument." The parties therefore have contractually limited the scope of the future advances clause, and it is not the open-ended agreement examined in *Central Production. See id.* at 6, 231 S.E.2d at 212–13 (reciting mortgage provisions examined). Because J. Conner was Brown's alter-ego, Brown paid the existing indebtedness in full. Additionally, no evidence exists of any future advances made under the mortgage by SCB & T. Thus, all sums secured by the mortgage have been paid and the mortgage by its terms has been satisfied.

## IV

For the foregoing reasons, although I disagree with the majority's limitation on the Statute of Elizabeth, I agree that we should not set aside the assignment because Appellants have not shown intent to defraud or hinder by clear and convincing evidence. However, I would find J. Conner was the alter-ego of Brown, and therefore J. Conner's payment to

---

19. For example, take the majority's illustration of an unused line of credit, presumably secured by a first lien on certain property. If the debtor owes no money under it and it sits unused, then there is nothing to collect. Heretofore, upon foreclosure of a junior lien this secured party would step up to the plate, take nothing (because that is what he is owed), and then move aside for the other creditors. Beginning today, however, that same secured party who is entitled to absolutely nothing can stand in the way of everyone else. An astute debtor therefore can simply take out a line of credit, never draw on it, and shut out all junior lienors.

SCB & T satisfied the note and the mortgage. I accordingly would affirm as modified in part and reverse in part.

Justice KITTREDGE.

I join section II of Justice Hearn's part concurrence, part dissent. I otherwise join the majority opinion, including the result.