# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Stoneledge at Lake Keowee Owners' Association, Inc.; C. Dan Carson; Jeffrey J. Dauler; Joan W. Davenport; Michael Furnari; Donna Furnari; Jessy B. Grasso; Nancy E. Grasso; Robert P. Hayes; Lucy H. Hayes; Ty Hix; Jennifer D. Hix; Paul W. Hund, III; Ruth E. Isaac; Michael D. Plourde; Mary Lou Plourde; Carol C. Pope; Steven B. Taylor; Bette J. Taylor; and Robert White, Individually and on Behalf of all others similarly situated, Petitioners-Respondents,

v.

IMK Development Co., LLC; Keowee Townhouses, LLC; Ludwig Corporation, LLC; SDI Funding, LLC; Medallion at Keowee, LLC; Integrys Keowee Development, LLC; Marick Home Builders, LLC; Bostic Brothers Construction, Inc.; Miller/Player & Associates; Bradford D. Seckinger; John Ludwig; William Cox; Larry D. Lollis; Rick Thoennes; M Group Construction and Development, LLC; Mel Morris; Joe Bostic; Jeff Bostic; Clear View Construction, LLC; Michael Franz; MHC Contractors; Miguel Porras Choncoas; Builders First Source-Southeast Group; Mike Green; Southern Concrete Specialties; Carl Compton d/b/a Compton Enterprize a/k/a Compton Enterprises; Gunter Heating & Air; All Pro Heating; A/C & Refrigeration, LLC; Coleman Waterproofing; Heyward Electrical Services, Inc.; Tinsley Electrical, LLC; Hutch N Son Construction, Inc.; Upstate Utilities, Inc.; Southern Basements; Carl Catoe Construction, Inc.; T.G. Construction, LLC; Delfino Construction; Francisco Javier Zarate d/b/a Zarate Construction; Alejandro Avalos Cruz; Herberto Acros Hernandez; Martin Hernandez-Aviles; Francisco Villalobos Lopez; Ambrosio Martinez-Ramirez; Ester

Moran Mentado; Socorro Castillo Montel; MJG
Construction and Homebuilders, Inc. d/b/a MJG
Construction; KMAC of the Carolinas, Inc.; Eufacio
Garcia; Everado Jarmamillio; Garcia Parra Insulation,
Inc.; J&J Construction; Jose Nino; Jose Manuel Garcia;
Eason Construction, Inc.; Vincent Morales d/b/a Morales
Masonry and Miller/Player & Associates, Defendants,

Of Which Marick Home Builders, LLC and Rick
Thoennes are the Respondents-Petitioners.

Appellate Case No. 2019-000038

---

**ON WRIT OF CERTIORARI TO THE COURT OF APPEALS**

---

Appeal from Oconee County
Alexander S. Macaulay, Circuit Court Judge

---

Opinion No. 28071
Heard October 14, 2020 – Filed December 8, 2021

---

**AFFIRMED IN PART; REVERSED IN PART; AND
REMANDED**

---

Robert T. Lyles Jr. and Lee Anne Walters, both of Lyles
& Associates, LLC, of Charleston, for Petitioners-
Respondents.

Jason M. Imhoff, of Kenison Dudley & Crawford, LLC,
of Greenville, for Respondents-Petitioners.

---

**JUSTICE JAMES:** This appeal stems from a construction defect lawsuit involving waterfront townhomes on Lake Keowee in Oconee County. After a two-week trial, Petitioners-Respondents Stoneledge at Lake Keowee Owners' Association, Inc. (the HOA) received plaintiff's verdicts against several defendants, including Respondents-Petitioners Marick Home Builders, LLC and Rick Thoennes. Marick Home Builders, Thoennes, and other defendants appealed, and in a pair of published opinions, the court of appeals affirmed in part and reversed in part. *Stoneledge at Lake Keowee Owners' Ass'n, Inc. v. IMK Dev. Co., LLC*, 425 S.C. 276, 821 S.E.2d 509 (Ct. App. 2018) (hereinafter *Stoneledge I*); *Stoneledge at Lake Keowee Owners' Ass'n, Inc. v. IMK Dev. Co., LLC*, 425 S.C. 268, 821 S.E.2d 504 (Ct. App. 2018) (hereinafter *Stoneledge II*).

We granted several writs of certiorari to review the court of appeals' decisions. In this opinion, we review *Stoneledge I* and address the trial court's (1) jury charge, (2) denial of Marick's directed verdict motions, (3) finding of amalgamation, and (4) calculation of damages.[1] We affirm the court of appeals as to the jury charge and as to the trial court's denial of Marick's motions. We reverse the court of appeals as to amalgamation. We affirm in part and reverse in part the court of appeals as to the amount of the judgment in favor of the HOA and remand to the circuit court for final calculation and entry of judgment consistent with this opinion.

## BACKGROUND

Immersion into the facts of this case and its knotty trial and appellate issues is not for the weary. In *Stoneledge I*, the court of appeals accurately summarized the pertinent facts and legal issues, but for easier reading, we will restate most of them. In 2002, Bostic Brothers Construction, Inc. (Bostic) began construction on a large luxury townhome project in Oconee County on Lake Keowee (Stoneledge). Construction of Stoneledge was divided into Phase I and Phase II. This litigation is limited to the thirty-seven units built during Phase I. Like other townhome communities, a homeowners' association would be responsible for maintaining the common areas and the exterior of the buildings. The stone-clad, waterfront

---

[1] To ensure a complete discussion of the calculation of damages in this case, we have addressed issues raised by the HOA and Bostic Brothers Construction, Inc. in their related appeal. We have issued a separate opinion addressing the other issues raised in that appeal. *Stoneledge at Lake Keowee Owners' Ass'n, Inc. v. IMK Dev. Co., LLC*, Op. No. 28070 (S.C. Sup. Ct. filed December 8, 2021) (Howard Adv. Sh. No. 43 at 11).

townhomes were marketed as "quality" construction and "maintenance free." A marketing brochure touted "pleasurable experiences all year long." Unfortunately for the homeowners, this turned out not to be the case.

Bostic was the original general contractor on the project and was a part-owner of the original development company, Keowee Townhouses, LLC. At the time, Bostic was a large construction company with several other projects throughout the Southeast. By late 2004, Bostic had problems finishing other jobs and ceased operations at Stoneledge; at that time, only a few Stoneledge units had been completed and sold. A homeowner compared Stoneledge to a "ghost town" and noted Bostic had completed the exteriors of the unsold units but had not finished the interiors before walking away. Stoneledge was on the brink of foreclosure.

In March 2005, Keowee Townhouses escaped foreclosure by selling the entire Stoneledge project, including the remaining twenty-five or so unfinished units in Phase I, to IMK Development Company, LLC. IMK is comprised of Integrys Keowee Development, LLC (IK) and Marick Home Builders, LLC (Marick). IK's members include William Cox and Larry Lollis. Marick's managing member and construction license holder is Rick Thoennes. IK provided the funding to complete construction, and Marick became the general contractor and completed Phase I.

Marick's site superintendent, Nathan Hornaday, testified he walked through the units shortly after IMK purchased the project to inspect for damage and to make a list of everything that needed to be fixed. He testified to the overall condition of the units and explained, "[M]ainly everything was finished except for, I think, two or three units. I'm not sure. And those units had all the exterior done. They didn't have sheetrock inside of them, but I believe -- I'm not sure, but I believe everything else was finished." Hornaday testified the exterior of the units, including the roofs, porches, decks, and siding, had been completed and that only two or three units needed doors installed. Hornaday testified Marick intended to fix all of the problems with the Phase I units.

Hornaday testified he pulled building permits needed to complete the unfinished units. The work description on a majority of the permits stated Marick was to "Complete Townhome from Rough-in Stage," but a few of the permits stated Marick was to "Complete Townhome from Foundation Stage." According to the permits, Marick estimated that the cost to complete the remaining units totaled more than $1.4 million. Marick worked to complete the unfinished units but also undertook repairs on some of the finished units. For example, Marick addressed a

variety of issues raised by Steven Taylor and Robert White, who owned finished townhomes, and contracted with a waterproofing company to apply a waterproof coating to all of the Phase I decks and porches.

IMK created the HOA in 2005, and the HOA board was comprised of IMK representatives—including Cox, Lollis, and Thoennes. A homeowner testified HOA board business was regularly conducted, but he noted there was not a lot of interaction between the board and the homeowners. IMK remained in control of the HOA board until September 2008, when IMK turned control of the board over to the homeowners. IMK sold Stoneledge to a new developer, S.D.I./Ludwig Corporation, LLC.

In late 2008 or early 2009, the homeowner-controlled HOA began receiving numerous requests for repairs of damage caused by water intrusion, and it did not take long for the HOA to realize it could not afford the repairs. The HOA paid to fix what it deemed "emergencies" and hired an engineering company to look deeper into the problems. Destructive testing revealed substantial water damage throughout Phase I. In May 2009, the HOA filed this action against a myriad of defendants, including developers, general contractors, subcontractors, and other individuals. The HOA asserted several causes of action, including the ones pertinent to this appeal: negligence, breach of the implied warranty of workmanlike service, breach of the implied warranty of habitability, and breach of fiduciary duty. Extensive discovery ensued, but the case finally made it to trial.

During the two-week trial, the defendants did not dispute the HOA's claim of faulty construction. All parties agreed the HOA's actual damages claim was limited to the cost of repair. The main disputes centered upon the scope and cost of those repairs and which defendants were responsible.[2]

Derek Hodgin, the HOA's forensic engineer, testified he found damage at every place he made a test cut. He testified water intrusion had caused extensive damage to roofs, windows, balconies, and foundations. He also testified the firewalls separating the units had been improperly installed. Hodgin testified the observations made by Marick when it took over the project triggered Marick's obligation as general contractor to perform a more thorough investigation to

---

[2] Bostic asserted a statute of limitations defense. That defense was addressed by the court of appeals in *Stoneledge II* and is the subject of our companion opinion in this case.

ascertain the source of the problems.  Hodgin testified to a broad, extensive scope of repair.  Bostic's expert, Richard Moore, presented a narrower, more surgical scope of repair.  Estimators testified it would cost $6,309,197 to implement Hodgin's scope of repair and slightly less than $4,000,000 to implement Moore's scope of repair.

Many defendants settled before and during trial.  When the jury began deliberations, the only remaining defendants were Bostic, Marick, IMK, IK, Thoennes, Cox, and Lollis.  The jury returned verdicts for the HOA as follows:

- $3,000,000 for negligence against Bostic and IMK/Marick;

- $1,000,000 for breach of the implied warranty of workmanlike service against Bostic and Marick;

- $1,000,000 for breach of fiduciary duty against IMK, IK, Thoennes, Lollis, and Cox.

After the jury verdicts were read, counsel for the HOA expressed confusion and asked the trial court if the verdicts were "cumulative," and the trial court replied that it thought they were.  Counsel for the defendants did not comment on this exchange, and no one, including the trial court, explained their understanding of what "cumulative" meant.  As we will explain, this confusion could have been completely avoided if just one party had requested the trial court to order the jury to reform its verdicts to reflect the same award of actual damages for each cause of action.

The trial then proceeded to the damages apportionment phase as to the negligence and breach of warranty verdicts.  After hearing brief arguments from counsel on apportionment, the jury allocated 60% of the negligence verdict against Bostic and 40% against IMK/Marick.  The jury allocated 70% of the breach of implied warranty verdict against IMK/Marick[3] and 30% against Bostic.

---

[3] The implied warranty verdict form lists Bostic and Marick as the potentially liable defendants; however, the subsequent apportionment form lists Bostic and "IMK/Marick" for the implied warranty award.  The record does not reveal why IMK was included on the apportionment form.  In any event, IMK was dismissed from the action while the case was pending before the court of appeals.

The trial court issued a Form 4 order entering judgment against Bostic and IMK/Marick in amounts reflecting the apportionments. The order also entered judgment against the five breach of fiduciary duty defendants in the amount of $200,000 each (obviously a division of $1,000,000 by five). Thereafter, counsel for the HOA appropriately notified the trial court that the HOA had previously received $2,855,911.77 in settlements from other Phase I defendants.

The parties timely filed post-trial motions, and, upon motion of the HOA, the trial court amended the three verdicts to award $5,000,000 to the HOA for each cause of action, subject to the apportionment percentages. The trial court then calculated the setoff of prior settlements paid by other Phase I defendants.

Marick, Thoennes, and Bostic appealed,[4] and the court of appeals issued two published opinions: *Stoneledge I*, 425 S.C. 276, 821 S.E.2d 509 (Ct. App. 2018) and *Stoneledge II*, 425 S.C. 268, 821 S.E.2d 504 (Ct. App. 2018). In *Stoneledge I*, the court of appeals reversed the trial court's decision to raise the three verdicts to $5,000,000 each, affirmed the trial court's denial of directed verdict motions, affirmed the trial court's "finding" of amalgamation, and adjusted the trial court's calculation of the final judgments. This Court granted cross-petitions for writs of certiorari arising from both *Stoneledge I* and *Stoneledge II*. This opinion is our review of *Stoneledge I*.

## DISCUSSION

The parties argue the trial court erred in its: (1) jury charge, (2) denial of directed verdict motions, (3) finding of amalgamation, and (4) calculation of damages to be awarded on the three causes of action at issue.

### A. Jury Charge

Marick argues the trial court erred by (1) not charging the jury that Marick could be held liable only for work it performed at Stoneledge and (2) charging the jury on breach of implied warranty of habitability. Marick contends the trial court's errors were prejudicial and require reversal. The court of appeals affirmed the trial court on those points and also rejected the HOA's preservation argument. *Stoneledge*

---

[4] IMK, IK, Lollis, and Cox also appealed, but the HOA's actions against them were dismissed during briefing at the court of appeals. The record does not reflect whether these dismissals arose from settlement or some other event.

*I*, 425 S.C. at 286-92, 821 S.E.2d at 514-17.  We agree with the court of appeals' entire analysis and therefore affirm.

## B. Directed Verdict

The court of appeals affirmed the trial court's denial of Marick's directed verdict motion as to the HOA's breach of implied warranty of workmanlike service claim and affirmed the trial court's denial of Marick's motion for a partial directed verdict on the negligence claim.  *Id.* at 293-96, 821 S.E.2d at 518-20.  Marick argues this was error.  We agree with the court of appeals' analysis of these two issues and therefore affirm.

## C. Amalgamation (Single Business Enterprise Theory)

Actions to pierce the corporate veil and to find a party responsible under the alter-ego theory lie in equity.  *Oskin v. Johnson*, 400 S.C. 390, 397, 735 S.E.2d 459, 463 (2012).  Likewise, an action to amalgamate parties lies in equity.  *See Pertuis v. Front Roe Rests., Inc.*, 423 S.C. 640, 648, 817 S.E.2d 273, 277 (2018) (noting equitable principles govern the application of amalgamation).  Therefore, our standard of review on this issue is de novo and allows us to find facts in accordance with our own view of the preponderance of the evidence.  *Oskin*, 400 S.C. at 397, 735 S.E.2d at 463.  Despite this broad standard of review, we are not required to disregard the trial court's findings of fact, and we are mindful the trial court sits in a better position to assess witness credibility.  *Id.*

South Carolina first recognized the theory of amalgamation in *Kincaid v. Landing Development Corp.*, 289 S.C. 89, 96, 344 S.E.2d 869, 874 (Ct. App. 1986), in which the court of appeals held "an amalgamation of corporate interests, entities, and activities . . . blur[red] the legal distinction between [three related] corporations and their activities . . . ."  Since then, this Court and the court of appeals have discussed the theory on several occasions.  *See Kennedy v. Columbia Lumber & Mfg. Co.*, 299 S.C. 335, 340-41, 384 S.E.2d 730, 734 (1989); *Mid-South Mgmt. Co. v. Sherwood Dev. Corp.*, 374 S.C. 588, 604-05, 649 S.E.2d 135, 144 (Ct. App. 2007); *Pope v. Heritage Cmtys., Inc.*, 395 S.C. 404, 417-20, 717 S.E.2d 765, 772-73 (Ct. App. 2011); *Magnolia N. Prop. Owners' Ass'n, Inc. v. Heritage Cmtys., Inc.*, 397 S.C. 348, 358-60; 725 S.E.2d 112, 117-18 (Ct. App. 2012).  We recently formally recognized and refined this theory in *Pertuis*, where we referred to the amalgamation theory as "the single business enterprise theory."  423 S.C. at 651, 817 S.E.2d at 278.  We will use those terms interchangeably in this opinion.

The parties have not raised this point, but the only decision made by the trial court regarding amalgamation was to deny Marick and Thoennes's directed verdict motion on that issue. The trial court never made a final ruling on the merits of the amalgamation claim, which was an equitable claim to be decided by the trial court, not by the jury. Even if the claim was to be decided by the jury, there was no jury charge, closing argument, verdict form, or jury verdict on amalgamation. During the post-trial motion stage, Marick and Thoennes argued only that the trial court erred in denying their motion for a directed verdict. In any event, for the duration of this appeal, the parties have treated the trial court's denial of the directed verdict motion as a final finding by the trial court on the merits, and the court of appeals treated it as such. Because the affected parties have treated the amalgamation claim as having been ruled upon on the merits, we will address the claim on the merits.

The HOA originally sued IMK, IK, Marick, Cox, Lollis, and Thoennes under the theories of amalgamation, alter ego, and piercing the corporate veil. However, at trial, the HOA conceded the theories of piercing the corporate veil and alter ego were not applicable and advised the trial court it was pursuing the theory of amalgamation as to IMK, Marick, and Thoennes. The trial court denied Marick and Thoennes's motion for a directed verdict on amalgamation, finding there was sufficient evidence of "self-dealing" to send that issue to the jury.

The court of appeals correctly noted the trial court conducted no analysis regarding the amalgamation of IMK, Marick, and Thoennes. *Stoneledge I*, 425 S.C. at 298, 821 S.E.2d at 520. Perhaps that is so because the trial court considered the issue only at the directed verdict stage and never decided the claim on the merits. Marick argues the court of appeals erred in affirming the trial court's amalgamation of Marick with IMK. Thoennes argues the court of appeals erred in affirming the trial court's amalgamation of him with IMK. Thoennes also argues there is no authority for the proposition that he, as an individual, can be amalgamated with a business entity such as IMK.[5] We agree with Marick and Thoennes.

In *Pertuis*, a restaurant manager was a minority shareholder in a corporation that owned the restaurant. 423 S.C. at 644, 817 S.E.2d at 275. The majority shareholders in this corporation owned shares in three other corporations. The restaurant manager claimed these three other corporations and the corporation that owned the restaurant were amalgamated into a single entity. The manager claimed

---

[5] Marick and Thoennes do not contest the trial court's amalgamation of their interests with one another.

this amalgamation entitled him to distributions from the three other corporations. We surveyed the law from several other jurisdictions and summarized the single business enterprise theory as follows:

> [W]here multiple corporations have unified their business operations and resources to achieve a common business purpose and where adherence to the fiction of separate corporate identities would defeat justice, courts have refused to recognize the corporations' separateness, instead regarding them as a single enterprise-in-fact, to the extent the specific facts of a particular situation warrant.

*Id.* at 652-53, 817 S.E.2d at 279. We acknowledged "corporations are often formed for the purpose of shielding shareholders from individual liability[,]" and we noted "there is nothing remotely nefarious in doing that." *Id.* at 655, 817 S.E.2d at 280. Thus, we held the single business enterprise theory requires more than just a showing that the various entities' operations are intertwined. For a court to combine different corporate entities into a single business enterprise, there must also be a showing of "bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions." *Id.* at 655, 817 S.E.2d at 281. We cautioned, "[a]s with other methods of piercing the corporate form that have previously been recognized in South Carolina, equitable principles govern the application of the single business enterprise remedy, and this doctrine 'is not to be applied without substantial reflection.'" *Id.* (quoting *Drury Dev. Corp. v. Found. Ins. Co.*, 380 S.C. 97, 101, 668 S.E.2d 798, 800 (2008)). We made clear the burden of proof lies with the person seeking to prove the existence of a single business enterprise. *Id.*

IMK, a limited liability company, was created to hold title to Stoneledge. IMK's members were IK and Marick, each holding a 50% interest in IMK. IK's members were Lollis (20%), Cox (40%), and Tim Roberson (40%). Marick's members were Thoennes (50%) and Thoennes's son (50%). The following trial testimony provides greater insight into IMK's structure and how these entities and individuals conducted business.

Lollis testified he invested in Stoneledge at Roberson's behest. Lollis testified he was strictly an investor; he claimed he did not have any other involvement in IMK and was not familiar with IMK's day-to-day business. Lollis testified he did not know whether IK participated in the sale of Stoneledge units. Lollis acknowledged he received money from IMK's sale of units, and he testified he did not know

whether there was any money left in IMK when IMK sold Stoneledge to S.D.I./Ludwig in 2008. Lollis testified he (1) did not know who was on the IMK HOA board, (2) did not attend any HOA board meetings, and (3) received copies of the meeting minutes in the mail. He testified he became aware of the construction defects only after the lawsuit was filed.

Cox, a managing member of IK, testified IK was formed to provide the investment capital needed to purchase and fund the Stoneledge project. Regarding the relationship between Marick and IK, he testified "Marick Home Builders was to provide the construction at their cost, and IK provided the investment. And [IK] did the books for IMK. And the agreement was we would split the profits [from the sale of the units]." Cox testified a couple of the salespeople for IMK were not employees of IK but were housed in IK's offices and used IK's email. Cox testified Marick was in charge of supervising these "contract salespeople."

Cox testified he negotiated IMK's sale of Stoneledge to S.D.I./Ludwig. He testified that sometime before the sale, he learned Marick owed money to S.D.I./Ludwig and that Marick pledged its profits from Stoneledge as collateral. Cox testified IK sold S.D.I./Ludwig its interest in IMK for cash, plus a percentage of the gross sales price for any remaining unsold units. Cox testified the funds IMK received from the sale were disbursed to IK's members. Cox testified that shortly after the sale, IMK turned the HOA board over to the homeowners. Cox testified IMK was insolvent and did not have any money to satisfy a possible judgment in favor of the HOA.

Thoennes testified he was the managing member and held the construction license for Marick. He testified his son, Rick Thoennes III, was also a member of Marick. Thoennes summarized the relationship between IK and Marick, stating "[IK] put in money; I put in hard labor." He testified that before IMK purchased the project, he inspected the units to make sure the project would be a good investment. Thoennes testified Marick charged IMK for Marick's construction costs. He explained he would submit an invoice to IMK, IMK would write a check to Marick, and Marick would pay its suppliers, employees, and subcontractors. When asked whether Marick was responsible for the management of the Stoneledge sales team, Thoennes replied, "For the most part[.] IMK had some responsibility in that too. I mean, the sales was -- all had to be approved by IMK and what we were doing, and then sales materials and all of those things. So certainly IMK had some responsibility for the sales." Thoennes testified it was Marick's decision as to what work needed to be done on the Phase I units. Thoennes testified that when a unit

owner had an issue, the owner would not go through a "formal process" by bringing the issue to the IMK-run HOA board but would bring it directly to him or Hornaday. Thoennes acknowledged he was an HOA board member. Thoennes testified about his many roles at Stoneledge:

> It depends on which hat I had on on that particular day. I've been -- [counsel for the HOA] said I sold them. Somebody else said I built them, and somebody else said I'm a director on the board.
>
> . . . .
>
> So I guess it depends on which hat I had. You know, on some days I would go out and jump somebody's car, so I guess I was a mechanic too. But I just -- you know, I didn't have the pleasure of being able to say, I'm a director now. At seven o'clock, I'm a contractor. At eight o'clock, I'm a marketing person. I didn't have that luxury. . . . It was very informal.

Thoennes testified Marick shut down its business shortly after the Stoneledge project failed.

Some of the homeowners were confused about the distinctions between and the roles these companies and individuals played. Homeowner Taylor testified he made no distinction between IMK and Marick. Further, Homeowner White testified, "IMK, to me, in terms of the faces of the folks that were part of IMK were Rick Thoennes and his son and Tim Roberson." White testified it was not until "later on" that he realized IMK was a combination of IK and Marick.

In their directed verdict motion on the amalgamation issue, Marick and Thoennes argued against the HOA's "piercing the corporate veil, amalgamation, alter ego, throw everything up against the wall, they're-all-together-and-everything-should-stick analysis." Marick and Thoennes presented a detailed argument to the trial court as to why the theories of piercing the veil, alter ego, and amalgamation should not be applied in this case. The HOA conceded that the theories of piercing the corporate veil and alter ego were inapplicable to Marick and Thoennes but argued amalgamation was a viable theory. The trial court denied Marick and Thoennes's

motion for directed verdict on the amalgamation claim, stating there were factual issues for the jury to resolve.

In addressing the merits of the amalgamation claim, the court of appeals acknowledged this case was tried before our decision in *Pertuis* but found the trial court "failed to conduct any meaningful analysis supporting an amalgamation of interests." *Stoneledge I*, 425 S.C. at 298, 821 S.E.2d at 520. Nevertheless, the court of appeals affirmed the trial court in result, holding, "[O]ur review of the record reveals evidence of a unified operation between Marick and the amalgamated parties as well as evidence of self-dealing that resulted from a blending of their business enterprises." *Id.* The court of appeals found the "bad faith, abuse, fraud, wrongdoing, or injustice" requirement was met because Thoennes had "at least constructive knowledge of the pervasive construction defects . . . but was nevertheless directly involved in IMK and Marick's marketing and sale of the units." *Id.* at 299-300, 821 S.E.2d at 521. The court of appeals concluded, "Given that Marick's and IMK's profits were entirely dependent on IMK's ability to sell the units, their operations were clearly in pursuit of a common business purpose, albeit to the detriment of the HOA members." *Id.* at 300, 821 S.E.2d at 521.

Because Marick and Thoennes are the only parties appealing this issue, we do not address the trial court's "decision" to amalgamate IMK with IK, Cox, and Lollis. Our de novo review of the evidence compels us to hold the court of appeals erred in affirming the trial court's "decision" to amalgamate IMK, Marick, and Thoennes. *See Pertuis*, 423 S.C. at 655, 817 S.E.2d at 281 (explaining the single business enterprise theory should only be applied after *substantial reflection*). As we held in *Pertuis*, a party seeking to impose the existence of a single business enterprise must show both (1) the intertwining of the operations of the entities and (2) evidence of "bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions."[6] 423 S.C. at 655, 817 S.E.2d at 280-81.

---

[6] In *Pertuis*, we adopted the reasoning of the Texas Supreme Court as to the single business enterprise theory. 423 S.C. at 655, 817 S.E.2d at 280. We noted the Texas Supreme Court has enumerated eight nonexclusive factors to be considered in determining whether constituent corporations have not been maintained as separate entities. *Id.* at 652, 817 S.E.2d at 279 n.5 (quoting *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 450-51 (Tex. 2008)). However, as we clearly stated in *Pertuis*, the *Gladstrong* court cautioned "the limitation on liability afforded by the corporate structure can be ignored only when the corporate form has been used as

Specifically, we hold the HOA failed to prove "bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions" sufficient to trigger the application of a single business enterprise between IMK, Marick, and Thoennes. The only evidence the court of appeals cited with regard to "bad faith, abuse, fraud, wrongdoing, or injustice" was:

> Thoennes, as Marick's principal and license holder, had at least constructive knowledge of the pervasive construction defects that plagued the project, but was nevertheless directly involved in IMK and Marick's marketing and sale of the units. Given that Marick's and IMK's profits were entirely dependent on IMK's ability to sell the units, their operations were clearly in pursuit of a common business purpose, albeit to the detriment of the HOA members.

*Stoneledge I*, 425 S.C. at 299-300, 821 S.E.2d at 521 (footnote omitted). Viewing the facts of this case with the requisite hesitancy to invade the LLC form, we do not believe these facts warrant the application of the single business enterprise theory. As noted above, in *Pertuis*, we held the single business enterprise theory requires more than just a showing that the various entities' operations are intertwined. A "common business purpose" is simply not enough. 423 S.C. at 653, 817 S.E.2d at 279. For a court to combine different business entities into a single business enterprise, there must also be a showing of "bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions." *Id.* at 655, 817 S.E.2d at 281. The conduct of Marick, Thoennes, and IMK did not rise to this level. Like other methods of invading the corporate form, invocation of the single business enterprise theory should be reserved for drastic situations and is the rare exception, not the rule.

For the same reasons, we conclude the evidence does not support a finding of amalgamation of Thoennes with IMK. In addition, we conclude the single business enterprise theory is not to be used to amalgamate an individual with a company. The

---

part of a basically unfair device to achieve an inequitable result." *Id.* (internal quotation marks omitted) (quoting *Gladstrong*, 275 S.W.3d at 451).

single business enterprise theory exists as an equitable remedy for plaintiffs whenever they have been wronged by <u>business entities</u> with blurred identities.[7]

Thus, under the facts of this case, we refuse to disregard the corporate form by amalgamating IMK, Marick, and Thoennes, and we therefore reverse the court of appeals on this issue. We express no opinion as to the viability of other methods of invading the LLC form in this case, such as veil piercing or alter ego.

### D. Damages

All of the parties argue the court of appeals erred in some manner when it recalculated the trial court's damages award.

The HOA concedes it seeks recovery for a single element of damage—the cost to repair Phase I construction. No one disputes that point. The HOA argued to the jury that it was entitled to $6,309,197 in damages, corresponding to the amount testified to by its expert. All defendants argued the HOA was entitled to the amount

---

[7] Other jurisdictions have held the single business enterprise theory is confined to the imposition of "shared liability on entities that are affiliated with a defendant entity" and have refused to apply the theory "to impose liability on individual persons." David J. Marchitelli, Annotation, *Disregard of Separate Existence of Corporations Under Single Business Enterprise Theory*, 50 A.L.R. 7th Art. 2 § 24 (2020); *see Angotti & Reilly, Inc. v. Rincon Residential Towers LLC*, No. A140648, 2015 WL 7294458 (Cal. Ct. App. Nov. 19, 2015) (applying California law); *Manhattan Constr. Co. v. Phillips*, No. 1:09-cv-1917, 2012 WL 13001890 (N.D. Ga. Apr. 9, 2012), *aff'd sub nom. Manhattan Constr. Co. v. Place Properties LP*, 559 F. App'x 856 (11th Cir. 2014) (applying Georgia law); *Nussli US, LLC v. Nola Motorsports Host Comm., Inc.*, No. 15-2167, 2016 WL 4063823 (E.D. La. July 29, 2016) (applying Louisiana law); *Andretti Sports Mktg. La., LLC v. Nola Motorsports Host Comm., Inc.*, 147 F. Supp. 3d 537 (E.D. La. 2015) (applying Louisiana law); *Sun Triangle, Inc. v. Image Stores, Inc.*, No. 96-3877, 1998 WL 252158 (E.D. La. May 15, 1998) (applying Louisiana law); *Spurgeon v. Leleux*, No. 6:11-CV-01807, 2019 WL 138388 (W.D. La. Jan. 8, 2019) (applying Louisiana law); *Medve Energy Ventures LLC v. Warhorse Oil & Gas LLC*, No. 6:17-cv-01336, 2018 WL 7051038 (W.D. La. Nov. 21, 2018), *report and recommendation adopted*, 2019 WL 303122 (W.D. La. Jan. 17, 2019) (applying Louisiana law).

testified to by the defense expert—slightly less than $4,000,000. The jury awarded the HOA damages as follows:

- $3,000,000 for negligence against Bostic and IMK/Marick;

- $1,000,000 for breach of the implied warranty of workmanlike service against Bostic and Marick;

- $1,000,000 for breach of fiduciary duty against IMK, IK, Thoennes, Lollis, and Cox.

Immediately after these verdicts were read, the trial court sent the jury out in preparation for the apportionment phase of the trial. Counsel for the HOA and the trial court engaged in an exchange that is very important to our review of the trial court's reformation of the jury verdicts:

> **Counsel for the HOA:** I have a question about the verdict. And I was concerned about this occurring. I'm not sure, looking at the verdict, what the jury is awarding me.

> **Trial Court:** They're awarding you what you asked for because you asked for three separate verdicts. Oh, excuse me. I take that back. [Bostic's counsel] asked.

> **Counsel for the HOA:** Yes, sir, he did. And so it is a cumulative award against different defendants of five million dollars?

> **Trial Court:** Well, the way the Defendants have been treating it, yes, it is cumulative because they've been treating them all as separate little things that they want -- what is it? -- apportionment on this one and apportionment on that one.

There was no explanation of what the word "cumulative" meant. No one asked the trial court to question the jury about its intent behind awarding verdicts in separate amounts nor did anyone ask the trial court to resubmit the damages issue to the jury with the instruction that the dollar amount of damages for each cause of action must be the same.

The apportionment phase of the trial took place immediately thereafter. After jury argument from the parties, apportionment forms for the negligence and breach of warranty claims were submitted to the jury. As to negligence, the jury found IMK/Marick 40% responsible and found Bostic 60% responsible. As to breach of the implied warranty of workmanlike service, the jury found IMK/Marick[8] 70% responsible and found Bostic 30% responsible. The trial court entered a Form 4 order awarding judgment. The judgment totals on this initial Form 4 mirrored the above-stated verdicts on the three claims ($3,000,000 + $1,000,000 + $1,000,000).

The parties filed numerous timely post-trial motions. In the lead up to the hearing on the post-trial motions, the HOA informed the trial court it had previously received $2,855,911.77 in settlements from other Phase I defendants. No one disputes that amount.

In its post-trial motion, the HOA requested the trial court to reform the jury's verdict and to amend the initial Form 4 to reflect that the verdicts were "cumulative" by raising the negligence, breach of warranty, and breach of fiduciary duty awards to $5,000,000 each. The trial court entered a revised Form 4, raising each award to $5,000,000. The trial court then applied setoff to the negligence, breach of warranty, and breach of fiduciary duty awards and also applied apportionment to the negligence and breach of warranty awards. After setting off the $2,855,911.77 in settlements and applying apportionment to the negligence and breach of warranty awards, the trial court entered judgment on those two causes of action as follows: (1) as to negligence, $2,144,088.23 against Bostic and $857,635.29 against IMK/Marick and (2) as to breach of the implied warranty of workmanlike service, $2,144,088.23 against Marick and $643,226.47 against Bostic. As previously noted, the jury found Bostic 60% responsible for the damages awarded for negligence and found IMK/Marick 70% responsible for the damages awarded for breach of the implied warranty of workmanlike service. In calculating the foregoing figures, the trial court did not apply the apportionment statute to a defendant's share of liability when that defendant was found to be more than 50% responsible. See S.C. Code Ann. § 15-38-15(A) (Supp. 2020). However, the trial court did apply the statute to

---

[8] As we stated in footnote 3, the verdict form first completed by the jury lists "Marick" for the breach of warranty award. The subsequent apportionment form completed by the jury lists "IMK/Marick" for the apportionment of the implied warranty award. This discrepancy is inconsequential for two reasons. First, IMK is not a party to this appeal, and second, no one asked for it to be rectified.

a defendant's share of liability when that defendant was found to be less than 50% responsible.

As to the cause of action for breach of fiduciary duty, the trial court entered judgment on the revised Form 4 in the amounts of $2,144,088.23 against IMK; $2,144,088.23 against IK; $2,144,088.23 against Cox; $2,144,088.23 against Lollis; and $2,144,088.23 against Thoennes. This reflects the trial court's application of setoff, but not apportionment, to the breach of fiduciary duty claim.

The court of appeals reversed the trial court, substantially revising the trial court's computation of the various judgments. *Stoneledge I*, 425 S.C. at 302-03, 821 S.E.2d at 522-23.

### 1. "Cumulative" Verdict

The court of appeals reversed the trial court's decision to increase each judgment to $5,000,000, holding this invaded the province of the jury. *Id.* at 302, 821 S.E.2d at 522. We agree with the court of appeals on that point.

The HOA argues the court of appeals erred in not affirming "the cumulative verdict of a single damage." The HOA asserts its single damage was the cost to repair the units and that there was no evidence to support a finding of different actual damages for the three causes of action. The HOA contends "[t]he trial judge simply applied the jury's findings, based upon his extensive observation of the trial and the evidence presented, and correctly applied the jury's verdict—$5,000,000—as the cumulative award for a single damage, regardless of the cause of action." In support of its argument, the HOA cites a now-depublished opinion of the court of appeals, *Keeter v. Alpine Towers International, Inc.*, Op. No. 2012-UP-692 (S.C. Ct. App. filed June 27, 2012).[9]

---

[9] Normally, we would not consider arguments citing to an unpublished decision. However, *Keeter* was a published decision at the time of this trial, and a petition for certiorari was pending in this Court when the instant case was tried. The trial court and the parties relied upon *Keeter* when the instant case was tried; however, while the petition for certiorari was pending with this Court to review *Keeter*, the parties in *Keeter* submitted a joint motion to dismiss. Two years after this case was tried, the Court granted the parties' joint motion and ordered the court of appeals' opinion

In *Keeter*, the plaintiff was severely injured in a fall during a high school recreational field day. *Id.* at *1. The jury returned a verdict for the plaintiff against the lone defendant on three separate causes of action: (1) $500 in actual damages for strict liability; (2) $900,000 in actual damages and $160,000 in punitive damages for negligent design; and (3) $2,500,000 in actual damages and $950,000 in punitive damages for negligent training. Before the jury was dismissed, and upon request of the plaintiff, the trial court inquired of the jury whether it intended the three separate actual damages awards be added to result in a total award or whether it intended that the awards be separate for each cause of action. The forelady responded the jury intended for the awards to be "cumulative," or added together. The trial court asked the same question as to punitive damages, and the forelady responded in the same fashion. The defendant did not ask for further clarification. The court of appeals held that in the context that the plaintiff sought and could receive only one damages award for the same injury, the dialogue between the trial court and the forelady established the jury intended the damages awards for each cause of action be added together for a total award of $3,400,500 actual damages and $1,110,000 punitive damages. *Id*. at *12.

The HOA seizes upon its and the trial court's use of the word "cumulative" immediately after the jury was released to establish all parties agreed at that time that each of the three verdicts were actually $5,000,000. We disagree. In light of the parties' reliance during the trial upon *Keeter*, which, again, was a published decision at the time of this trial, it was reasonable for the defendants to conclude the trial court intended the breach of warranty and negligence verdicts against Bostic and IMK/Marick to be added together to amount to $4,000,000 and the breach of fiduciary duty verdicts against the remaining defendants to remain at $1,000,000.[10]

---

to be depublished. *See Keeter v. Alpine Towers Int'l, Inc.*, 410 S.C. 445, 766 S.E.2d 375 (2014).

[10] The court of appeals also noted Marick's argument that the HOA should have been required to elect a remedy between the three causes of action. The court held Marick's argument was unpreserved because Marick did not object to the trial court's ruling that the awards were "cumulative." However, the court of appeals went on to hold that setoff should be applied proportionately to the three awards as to all defendants, including Marick. We agree with this method of setoff under the facts and posture of this case, and we conclude it moots Marick's election of remedies argument.

In the case before us, the parties agree the HOA sought and could receive only one actual damages award for each cause of action. However, no party asked the trial court to request the jury for any clarification of the verdicts. The HOA submits no authority to support the trial court's reformation of the jury's verdict without receiving the input of the jury and relies upon the trial court's "extensive observation of the trial and the evidence presented." *See Joiner v. Bevier*, 155 S.C. 340, 355, 152 S.E. 652, 657 (1930) ("A jury's verdict should be upheld, when it is possible to do so, and carry into effect what was clearly the jury's intention. It is our duty to enforce a verdict, not to make it." (internal citation omitted)); *Camden v. Hilton*, 360 S.C. 164, 173, 600 S.E.2d 88, 92 (Ct. App. 2004) ("[I]t is not for the trial court to say what it thinks the verdict should be."). Did the jury find the HOA proved damages of $5,000,000 for each cause of action, as the HOA claims? Perhaps, but perhaps not. Did the jury find the HOA proved damages of $4,000,000? Perhaps, but perhaps not. Absent further dialogue with the jury, there was simply no way for the trial court to tell without speculating what the jury intended.

The trial court erred in reforming the verdicts on its own, absent a request from a party to resubmit the case to the jury with instructions that the dollar amounts for each verdict had to be the same. *See Rhame v. City of Sumter*, 113 S.C. 151, 154, 101 S.E. 832, 833 (1920) ("While the verdict is unusual, no effort was made to correct it before the jury had separated. His honor would have done so had he been requested to find out just what the jury meant, and had the verdict reformed."), *overruled on other grounds by Rourk v. Selvey*, 252 S.C. 25, 164 S.E.2d 909 (1968); *Anderson v. Aetna Cas. & Sur. Co.*, 175 S.C. 254, 282, 178 S.E. 819, 829 (1934) ("The law rather forbids this court assuming to take upon itself the powers, duties, rights, and privileges of a jury." (quoting *Sanders v. Commonwealth Life Ins. Co. of Ky.*, 134 S.C. 435, 440, 132 S.E. 828, 830 (1926))); *Allegro, Inc. v. Scully*, 400 S.C. 33, 49, 733 S.E.2d 114, 123 n.9 (Ct. App. 2012) ("If a jury verdict form is ambiguous or unclear, the jury should be returned to the jury room in order to clarify or conform the verdict to its intent before the jury is excused.").

The court of appeals correctly held the trial court invaded the province of the jury by reforming the verdicts on its own. *Stoneledge I*, 425 S.C. at 302, 821 S.E.2d at 522. We hold the silence of the defendants in the face of the trial court's statement that the verdicts were "cumulative" was of no significance because, in light of *Keeter*, the term "cumulative" was subject to a different meaning from what the plaintiff and the trial court intended. It was entirely reasonable for defense counsel to take the trial court's comment as its conclusion that the verdicts would be added

together, as the verdicts were in *Keeter*. Because no party requested the trial court resubmit the verdict forms to the jury with instructions to make the verdicts consistent, we affirm the court of appeals' holding that the three verdicts must stand as delivered by the jury. We repeat that this entire problem and the appellate distress it has caused could have been avoided if just one party had requested the trial court to resubmit the verdicts to the jury with instructions to make them consistent.

We now turn to the application of setoff to the three verdicts.

## 2. Setoff

South Carolina courts have consistently held "there can be only one satisfaction for an injury or wrong." *Smith v. Widener*, 397 S.C. 468, 471, 724 S.E.2d 188, 190 (Ct. App. 2012) (quoting *Hawkins v. Pathology Assocs. of Greenville, P.A.*, 330 S.C. 92, 113, 498 S.E.2d 395, 407 (Ct. App. 1998)). "Therefore, before entering judgment on a jury verdict, the court must reduce the amount of the verdict to account for any funds previously paid by a settling defendant, so long as the settlement funds were paid to compensate the same plaintiff on a claim for the same injury." *Id.* at 471-72, 724 S.E.2d at 190 ("When the settlement is for the same injury, the nonsettling defendant's right to a setoff arises by operation of law."). "The right of setoff has existed under the common law for over 100 years." *Riley v. Ford Motor Co.*, 414 S.C. 185, 195, 777 S.E.2d 824, 830 (2015).

The Uniform Contribution Among Tortfeasors Act (the Act) "represents the Legislature's determination of the proper balance between preventing double-recovery and South Carolina's 'strong public policy favoring the settlement of disputes.'" *Id.* at 196, 777 S.E.2d at 830 (quoting *Chester v. S.C. Dep't of Pub. Safety*, 388 S.C. 343, 346, 698 S.E.2d 559, 560 (2010)). Section 15-38-50 of the Act codifies the principle of setoff for settlements paid by persons liable in tort to another:

> When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
>
> (1) it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide, but it reduces the claim against the others to

the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and

(2) it discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

S.C. Code Ann. § 15-38-50 (2005).

### a) Application of Setoff to the Breach of Fiduciary Duty Award

The trial court applied setoff to the breach of fiduciary duty award against Thoennes, but the court of appeals reversed concluding that because none of the defendants who settled with the HOA before and during trial were sued for breach of fiduciary duty, none of the settlement proceeds included damages directly resulting from breach of fiduciary duty. *Stoneledge I*, 425 S.C. at 302-03, 821 S.E.2d at 523. We agree setoff does not apply to the breach of fiduciary duty award, but we reach this conclusion for a different reason.

The HOA contends that because the damages it sought for each cause of action and because all the settlements it received were for the same injury—cost of repair— setoff applies to the breach of fiduciary duty award. Bostic, Marick, and Thoennes argue setoff should not apply to the breach of fiduciary duty award, citing subsection 15-38-20(G) of the Act, which provides, "This chapter does not apply to breaches of trust or of other fiduciary obligation." We agree with Bostic, Marick, and Thoennes.

As we noted above, "[t]he right of setoff has existed under the common law for over 100 years." *Riley*, 414 S.C. at 195, 777 S.E.2d at 830. We noted in *Rutland v. South Carolina Department of Transportation* that allowing a setoff "prevents an injured person from obtaining a double recovery for the damage he sustained, for it is 'almost universally held that there can be only satisfaction for an injury or wrong.'" 400 S.C. 209, 216, 734 S.E.2d 142, 145 (2012) (quoting *Truesdale v. S.C. Highway Dep't*, 264 S.C. 221, 235, 213 S.C.2d 740, 746 (1975), *overruled on other grounds by McCall v. Batson*, 285 S.C. 243, 329 S.E.2d 741 (1985)). The provisions of subsection 15-38-20(G) prohibiting the application of setoff to a breach of fiduciary duty award are in derogation of this common law principle. We recently cited the settled rule that "[s]tatutes in derogation of the common law are to be strictly construed[,]" and "[u]nder this rule, a statute restricting the common law will not be

extended beyond the clear intent of the legislature." *Eades v. Palmetto Cardiovascular & Thoracic, PA*, 422 S.C. 196, 201, 810 S.E.2d 848, 850 (2018) (internal quotation marks omitted) (quoting *Grier v. AMISUB of S.C., Inc.*, 397 S.C. 532, 536, 725 S.E.2d 693, 696 (2012)).

The Act is a part of Chapter 38. In fact, the Act is the only statutory scheme in Chapter 38. The Act governs the setoff of prior settlements paid by tortfeasors, and breach of fiduciary duty is a tort. Because subsection 15-38-20(G) of the Act provides Chapter 38 does not apply to breaches of trust or other fiduciary obligation, the General Assembly clearly intended Chapter 38 to prohibit the application of setoff to a breach of fiduciary duty award. Therefore, we hold the $1,000,000 breach of fiduciary duty award against Thoennes is not subject to setoff.

### b) Application of Setoff to the Breach of Warranty Award

Bostic argues the court of appeals erred in holding setoff applies to the breach of warranty award. Bostic asserts that only the negligence award should be subject to setoff. Bostic contends setoff is only available for tort claims and because breach of warranty is a contract claim, setoff is inapplicable.

Bostic is correct that claims for negligence sound in tort and claims for breach of warranty generally sound in contract. Bostic is also correct that the Act discusses setoff in the context of tort claims. *See* § 15-38-50 (explaining setoff is available for "tortfeasors" who are "liable in tort"). The Act governs the setoff of prior settlements paid by those liable in tort, not those liable in contract. However, nothing in the Act prohibits the application of common law setoff to a claim founded in contract. *See Riley*, 414 S.C. at 195, 777 S.E.2d at 830 ("The right to setoff has existed at common law in South Carolina for over 100 years."). Therefore, setoff can be applied to the breach of warranty award.

### c) Application of Setoff to the Negligence Award

All parties agree setoff applies to the negligence award. The parties disagree as to the setoff figures to be applied to calculate the final judgments. We make those calculations below in subsection D.4 (Judgment Amounts).

### 3. Apportionment

Subsection 15-38-15(A) of the Act provides for apportionment of liability among joint tortfeasors arising from tortious conduct:

> In an action to recover damages resulting from personal injury, wrongful death, or damage to property or to recover damages for economic loss or for noneconomic loss such as mental distress, loss of enjoyment, pain, suffering, loss of reputation, or loss of companionship resulting from tortious conduct, if indivisible damages are determined to be proximately caused by more than one defendant, joint and several liability does not apply to any defendant whose conduct is determined to be less than fifty percent of the total fault for the indivisible damages as compared with the total of: (i) the fault of all the defendants; and (ii) the fault (comparative negligence), if any, of plaintiff. A defendant whose conduct is determined to be less than fifty percent of the total fault shall only be liable for that percentage of the indivisible damages determined by the jury or trier of fact.

S.C. Code Ann. § 15-38-15(A) (Supp. 2020). In this subsection, "the legislature abrogated pure joint and several liability for joint tortfeasors who are less than fifty percent at fault." *Smith v. Tiffany*, 419 S.C. 548, 552-53, 799 S.E.2d 479, 481 (2017).

As noted, breach of warranty claims generally sound in contract, not in tort, so the breach of warranty verdict was not subject to apportionment. However, at trial, the parties agreed the jury should apportion responsibility for the breach of warranty award between Bostic and Marick. Under subsection 15-38-15(A), Bostic is liable for the entire negligence verdict of $3,000,000, and Marick is liable for its apportioned share of $1,200,000. Marick is liable for the entire $1,000,000 breach of warranty verdict, and Bostic is liable for its apportioned share of $300,000. As we will now discuss, these amounts must be adjusted to take into account (1) pro rata allocation between the verdicts for these two causes of action and (2) setoff of the prior settlements.

### 4. Judgment Amounts

The jury awarded $3,000,000 for negligence; $1,000,000 for breach of the implied warranty of workmanlike service; and $1,000,000 for breach of fiduciary duty, for a total award of $5,000,000. The HOA received $2,855,911.77 in settlements from other Phase I defendants. Had the jury been instructed to return one consistent verdict of actual damages, the application of setoff and the calculation

of the net judgments after apportionment would have been simple. However, we find it appropriate to apply a pro rata allocation of the $2,855,911.77 setoff to the negligence and breach of warranty verdicts. Of course, we must also take into account the apportionment percentages rendered by the jury.

The court of appeals correctly held—but, as discussed above, for the incorrect reason—that the breach of fiduciary duty verdict against Thoennes was not subject to setoff. *Stoneledge I*, 425 S.C. at 302-03, 821 S.E.2d at 523. The court of appeals also correctly held the $4,000,000 in combined verdicts against Bostic and Marick were subject to setoff in the amount of $2,855,911.77. *Id.* However, the court of appeals mistakenly concluded this calculation would leave a $2,144,088.23 net judgment to be allocated between the negligence and breach of warranty verdicts. *Id.* The correct figure is $1,144,088.23. The court of appeals correctly held "it would be proper to allocate three-fourths of the remaining judgment to the negligence cause of action and the remaining one-fourth to the [breach of warranty] cause of action." *Id.*

As noted above, during the apportionment phase, the jury found Bostic was 60% responsible for the negligence award, Marick was 40% responsible for the negligence award, Marick was 70% responsible for the breach of warranty award, and Bostic was 30% responsible for the breach of warranty award. Under subsection 15-38-15(A) of the Act, a defendant whose conduct is found to be less than fifty percent of the total fault is liable for only that percentage of the damages determined by the fact finder. Joint and several liability is assigned to defendants found liable for fifty percent or more of the damages. After applying the correct setoff, the apportionment percentages determined by the jury, and the apportionment statute, we hold the resulting judgments to be entered are as follows:

-   Bostic: $858,066.17 for negligence (joint and several liability for prorated verdict after setoff) and $85,806.62 for breach of warranty (30% of prorated verdict after setoff)
-   Marick: $286,022.06 for breach of warranty (joint and several liability for prorated verdict after setoff) and $343,226.47 for negligence (40% of prorated verdict after setoff)
-   Thoennes: $1,000,000 for breach of fiduciary duty (no setoff applied)

These figures do not take into account the HOA's monetary settlements (if any) with IMK, IK, Cox, and Lollis during the pendency of this appeal.

## CONCLUSION

Based on the foregoing, we affirm in part and reverse in part the court of appeals. We remand this matter for final calculation and entry of judgment consistent with our opinion.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**

**BEATTY, C.J., KITTREDGE, HEARN and FEW, JJ., concur.**